**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| GENGHISCOMM HOLDINGS, LLC,<br>*Plaintiff*,<br>v.<br>SAMSUNG ELECTRONICS AMERICA, INC.,<br>*Defendant*. | Case No. 2:24-cv-00242-RWS-RSP<br>**JURY TRIAL DEMANDED** |

**DEFENDANT'S RESPONSIVE CLAIM CONSTRUCTION BRIEF**

# TABLE OF CONTENTS


I. INTRODUCTION .......... 1

II. THE PERSON HAVING ORDINARY SKILL IN THE ART .......... 1

III. CONSTRUCTION OF DISPUTED TERMS AND PHRASES .......... 2

A. discrete Fourier transform / inverse discrete Fourier transform ('792 Patent, claims 2 (via 1), 9 (via 8); '568 Patent, claims 2, 25; '227 Patent, claims 18, 24-25 (via 22); '508 Patent, claims 1, 2, 17) .......... 2

B. selectable subcarrier spacings ('508 Patent, claims 1, 2, 17, 18; '005 Patent, claims 7, 19; '792 Patent, claims 2 (via 1), 9 (via 8)) .......... 6

C. spread / spreading ('842 Patent, claim 1; '227 Patent, claims 18, 21 (via 11), 24-25 (via 22); '568 Patent, claims 2, 6, and 9 (via 1), 11 (via 1), 25; '786 Patent, claims 2, 6, and 8 (via 1), 11, 15, 17 (via 10)) .......... 8

D. at least one of known training symbols and synchronization symbols ('842 Patent, claim 4) .......... 9

E. a transceiver-control circuitry configured for: provisioning a consecutive series of Orthogonal Frequency Division Multiplexing (OFDM) subcarriers for uplink or downlink communications; provisioning a plurality of different selectable subcarrier spacings for the consecutive series of OFDM subcarriers ('508 Patent, claim 17) .......... 10

F. provisioning ('508 Patent, claims 1, 2 (via 1) 17, 18 (via 17)) .......... 12

G. a mapper configured to map the DFT-spread data signal to a plurality of OFDM subcarriers ('842 Patent, claim 1) .......... 14

H. Preambles of claims 1 and 10 of the '786 Patent .......... 18

I. further comprising adding a cyclic prefix to the time-domain waveform ('285 Patent, claims 7 and 17) .......... 20

J. a first of the set of data symbols / a second of the set of data symbols ('285 Patent, claims 7, 9 (via 1) and 17, 19 (via 11)) .......... 21

K. wherein the spreading matrix comprises an N-point Discrete Fourier Transform (DFT) ('227 Patent, cl. 18) .......... 23

L. User Equipment ('227 Patent, claims 21, 24) .......... 25

M. A User Equipment configured to perform the method recited in claim 11 ('227 Patent, cl. 21) ........ 27

IV. CONCLUSION ........ 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Lab'ys v. Andrx Pharms., Inc.*,
473 F.3d 1196 (Fed. Cir. 2007)....................26

*Abbott Labs. v. Baxter Pharm. Prods.*,
334 F.3d 1274 (Fed. Cir. 2003)....................10

*ACTV, Inc. v. Walt Disney Co.*,
346 F.3d 1082 (Fed. Cir. 2003)....................3

*Allen Eng'g Corp. v. Bartell Indus.*,
299 F.3d 1336 (Fed. Cir. 2002)....................25

*Atos, LLC v. Allstate Ins. Co.*,
No. 2023-1621, 2025 WL 1482404 (Fed. Cir. May 23, 2025)....................26

*Braintree Lab'ys, Inc. v. Novel Lab'ys, Inc.*,
749 F.3d 1349 (Fed. Cir. 2014)....................26

*Catalina Mktg. Int'l v. Coolsavings.com, Inc.*,
289 F.3d 801 (Fed. Cir. 2002)....................29

*DDR Holdings, LLC v. Priceline.com LLC*,
122 F.4th 911 (Fed. Cir. 2024)....................5, 26

*Digital Biometrics, Inc. v. Identix, Inc.*,
149 F.3d 1335 (Fed. Cir. 1998)....................12

*Entropic Commc'ns, LLC v. Charter Commc'ns, Inc.*,
No. 2:22-cv-125-JRG, 2023 U.S. Dist. LEXIS 109786 (E.D. Tex. Jun. 26, 2023)....................6

*In re Fought*,
941 F.3d 1175 (Fed. Cir. 2019)....................18

*In re Fuetterer*,
319 F.2d 259 (C.C.P.A. 1963)....................16

*Gen. Elec. Co. v. Wabash Appliance Co.*,
304 U.S. 364 (1938)....................15

*Greenberg v. Ethicon Endo-Surgery, Inc.*,
91 F.3d 1580 (Fed. Cir. 1996)....................15

*H-W Tech., L.C. v. Overstock.com, Inc.*,
758 F.3d 1329 (Fed. Cir. 2014)....................30

*Halliburton Energy Servs., Inc. v. M-I LLC*,
514 F.3d 1244 (Fed. Cir. 2008)....................15

*Halliburton Oil Well Cementing Co. v. Walker*,
329 U.S. 1 (1946)....................15

*Hytera Communc'ns Co. v. Motorola Sols., Inc.*,
841 F. App'x 210 (Fed. Cir. 2021) ....................10

*In re Kiely*,
No. 2022-1076, 2022 U.S. App. LEXIS 15693 (Fed. Cir. Jun. 8, 2022)....................10

*Markem-Imaje Corp. v. Zipher Ltd.*,
No. 07-cv-00006-PB, 2012 U.S. Dist. LEXIS 112502 (D. N.H. Aug. 9, 2012)................16, 30

*Mass Inst. of Tech. v. Shire Pharms., Inc.*,
839 F.3d 1111 (Fed. Cir. 2016)....................5

*Medtronic, Inc. v. Teleflex Life Scis. Ltd.*,
Nos. 2022-1605, 2022-1606, 2024 WL 1208642 (Fed. Cir. Mar. 21, 2024)....................11, 12

*Motion Games, LLC v. Nintendo Co.*,
No. 12-cv-878, 2015 WL 11170167 (E.D. Tex. Jan. 16, 2015) ....................30

*NetSocket, Inc. v. Cisco Sys., Inc.*,
No. 2:22-cv-172-JRG, 2024 WL 5454527 (E.D. Tex. May 29, 2024)....................28, 29, 30

*Nystrom v. TREX Co.*,
424 F.3d 1136 (Fed. Cir. 2005)....................7

*Personalized Media Commc'ns, LLC v. Apple, Inc.*,
2016 WL 6247054 (E.D. Tex. Oct. 16, 2016) ....................2

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) ....................1, 3, 7

*Phonometrics, Inc. v. N. Telecom Inc.*,
133 F.3d 1459 (Fed. Cir. 1998)....................13

*Profectus Tech. LLC v. Huawei Techs. Co.*,
823 F.3d 1375 (Fed. Cir. 2016)....................5, 7

*Sony Interactive Ent. LLC v. Intell. Pixels Ltd.*,
No. 2022-2118, 2023 WL 6773879 (Fed. Cir. Oct. 13, 2023)....................26

*SQWIN SA v. Walmart Inc.*,
No. 4:22-cv-1040-SDJ, 2023 U.S. Dist. LEXIS 218845 (E.D. Tex. Dec. 8, 2023) ....................6

*SuperGuide Corp. v. DirectTV Enters., Inc.*,
358 F.3d 870 (Fed. Cir. 2004)....................9

*Synchronoss Techs., Inc. v. Dropbox, Inc.*,
987 F.3d 1358 (Fed. Cir. 2021)....................25

*Trs. of Columbia Univ. in City of New York v. Symantec Corp.*,
811 F.3d 1359 (Fed. Cir. 2016)....................24

*Wi-LAN, Inc. v. Apple Inc.*,
811 F.3d 455 (Fed. Cir. 2016)....................21

**Statutes**

35 U.S.C. § 112....................14, 16, 29

**Other Authorities**

MPEP 2173.05(f) ....................29

William Strunk, Jr. & E.B. White, *The Elements of Style* 84 (4th ed. 2000)....................19

**TABLE OF EXHIBITS**

| Exhibit | Description |
|---|---|
| I | U.S. Pat. No. 7,430,257 |
| J | U.S. Pat. No. 9,819,449 |
| K | U.S. Provisional Application No. 60/286,850 |
| 26 | Declaration of Steve Shattil, Under 37 C.F.R. 1.131(a), regarding U.S. Patent No. 9,768,842 (executed May 9, 2025) |
| 27 | Declaration of Steve Shattil, Under 37 C.F.R. 1.131(a), regarding U.S. Patent No. 10,200,227 (executed June 28, 2024) |
| 28 | Declaration of Steve Shattil, Under 37 C.F.R. 1.131(a), regarding U.S. Patent No. 10,389,568 (executed May 9, 2025) |
| 29 | Declaration of Steve Shattil, Under 37 C.F.R. 1.131(a), regarding U.S. Patent No. 11,075,786 (executed May 9, 2025) |
| 30 | Declaration of Steve Shattil, Under 37 C.F.R. 1.131(a), regarding U.S. Patent No. 11,223,508 (executed May 9, 2025) |
| 31 | Declaration of Steve Shattil, Under 37 C.F.R. 1.131(a), regarding U.S. Patent No. 11,252,005 (executed May 9, 2025) |
| 32 | Declaration of Steve Shattil, Under 37 C.F.R. 1.131(a), regarding U.S. Patent No. 11,381,285 (executed May 9, 2025) |
| 33 | Declaration of Steve Shattil, Under 37 C.F.R. 1.131(a), regarding U.S. Patent No. 11,424,792 (executed May 9, 2025) |

Defendant Samsung Electronics America, Inc. ("SEA") respectfully submits this Responsive Claim Construction Brief regarding the interpretation of certain claim terms of the eight patents-in-suit. *See* Exs. A-H.[1]

## I. INTRODUCTION

There are eight patents-in-suit. While the patents-in-suit claim the benefit of patent applications filed between 2002 and 2007, they did not issue until much later, after the named inventor and director of Plaintiff tried to copy industry standards. The parties dispute the meaning of fourteen claim terms. Plaintiff relies extensively on two declarations and substantial amounts of extrinsic evidence that is not contemporaneous with the alleged invention. Plaintiff fails to fully address the intrinsic evidence, grapple with its chosen claim language, or address meaningful differences between the varied patent specifications and claims.

SEA's proposed constructions stay true to the language of the claims and reflect the understanding conveyed by the respective patent documents. And, for at least three terms, SEA has demonstrated—by clear and convincing evidence—that the claim language chosen by the named inventor and patent agent Mr. Shattil is indefinite.

Finally, Plaintiff falsely accuses SEA of failing to provide its disclosures in advance of the deadline set forth in this Court's Patent Local Rules as pretense for suggesting that it may seek to file a *third* expert declaration. But SEA has complied with this Court's rules and the Docket Control Order and there is no basis for Plaintiff to submit yet another declaration at this late stage.

## II. THE PERSON HAVING ORDINARY SKILL IN THE ART

Claims are construed from the perspective of a person having ordinary skill in the art at the time of the alleged invention. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (*en*

[1] Exhibits A-H and 1-25 (Dkt. 125-1 to 125-31) were filed by Plaintiff with its Opening Brief. Exhibits I-K and 26-33 have been filed contemporaneously with SEA's Responsive Brief.

*banc*). The parties offer slightly different opinions about the qualifications of a person of ordinary skill in the art (POSITA), with Plaintiff's proposal resulting in a POSITA with more skill in a narrower field. *Compare* Ex. 1, ¶17 *with* Ex. 3, ¶33. Dr. Mahon's opinion is that a POSITA would have had a master's degree in electrical engineering or a related field, or a bachelor's degree and three years of relevant experience. Ex. 3, ¶33. Plaintiff has presented declarations indicating that the date of invention was between 1999 and 2003. Exs. 26-33.

## III. CONSTRUCTION OF DISPUTED TERMS AND PHRASES

### A. **discrete Fourier transform / inverse discrete Fourier transform** ('792 Patent, claims 2 (via 1), 9 (via 8); '568 Patent, claims 2, 25; '227 Patent, claims 18, 24-25 (via 22); '508 Patent, claims 1, 2, 17)

| GenghisComm's Position | SEA's Position |
|---|---|
| The Discrete Fourier Transform (DFT) and Inverse Discrete Fourier Transform (IDFT) include their respective calculation via a Fast Fourier Transform (FFT) and an Inverse Fast Fourier Transform (IFFT). | Plain and ordinary meaning |

Plaintiff's proposed construction does not even attempt to elaborate on what the "discrete Fourier transform" and "inverse discrete Fourier transform" are. Instead, Plaintiff's proposed construction simply reproduces the claim language and then asks the Court to usurp the role of the jury and hold as a matter of law that "fast algorithms" that can be used to calculate DFTs and IDFTs are the same thing as the transforms themselves. Plaintiff's construction is flawed because it (1) seeks to rewrite the claim language, (2) ignores differences in claim language in which these terms appear, (3) seeks a one-size-fits-all construction contrary to the specifications of the relevant patents, and (4) relies on extrinsic evidence that is irreconcilable with the claim language and bears no relation to the alleged time of invention in 1999-2003.

*First*, it is well established that "courts may not redraft claims," and the Court must construe the claim "as written, not as the patentees wish they had written it." *Personalized Media Commc'ns, LLC v. Apple, Inc.*, 2016 WL 6247054, at *24 (E.D. Tex. Oct. 16, 2016) (quoting *Chef*

*Am., Inc. v. Lamb-Weston Inc.*, 358 F.3d 1371, 1373-74 (Fed. Cir. 2004)). Here, Plaintiff chose to claim a mathematical operation (specifically, a transform), not all algorithms that can be used as a shortcut in calculating the transform. Having chosen to claim the mathematical operation, Plaintiff may not now contend that the claim should be rewritten to recite "fast algorithms" that are procedures for calculating the DFT/IDFT.

*Second*, Plaintiff's construction is not supported by the surrounding claim language, which "must be considered in determining the ordinary and customary meaning" of the claim terms. *ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1088 (Fed. Cir. 2003); *see also Phillips*, 415 F.3d at 1314 ("the claims themselves provide substantial guidance as to the meaning of particular claim terms."). Plaintiff seeks to conflate the claimed transforms (DFTs and IDFTs) with "fast algorithms" that can be used to calculate the result of a transform without regard to the context provided by the claims. *See* Dkt. 122 at 3; Ex. 1, ¶¶117-119.

This table shows the DFT and IDFT terms (in bold) in the context of the claim language:

| | |
|---|---|
| **'227 Pat., cl. 18:** | "the spreading matrix comprises an N-point **Discrete Fourier Transform** (DFT)" |
| **'227 Pat., cl. 22:** | "perform an M-point inverse **discrete Fourier transform** (IDFT)" |
| **'568 Pat., cls. 2, 25:** | "a plurality of orthogonal spreading codes comprising complex-valued coefficients of a **discrete Fourier transform** (DFT)" |
| **'508 Pat., cls. 1, 17:** | "performing **discrete Fourier transform** coding on a plurality of data symbols [to produce DFT coded data symbols]"<br>"performing an **inverse discrete Fourier transform** on the coded symbols" |
| **'792 Pat., cls. 1, 8:** | "polyphase codes derived from a **discrete Fourier transform**" |

In the context of the claim language Plaintiff's construction makes no sense. For example, claim 18 of the '227 Patent[2] limits "the spreading matrix" to an N-point DFT. Ex. B, cl. 18. Plaintiff offers no explanation of how a spreading matrix can "comprise" any of the "multiple … algorithms" for calculating the DFT. Ex. 1, ¶117. As another example, claims 2 and 25 of the '568 Patent recite "complex-valued coefficients of a discrete Fourier transform (DFT)"—not the calculation of a DFT. Ex. C, cls. 2, 25. Thus, the claim language uses a DFT to modify "complex-valued coefficients." *Id.* Plaintiff does not explain how "complex-valued coefficients of" multiple algorithms for calculating a DFT makes any sense in the context of the claims. In the '508 Patent, the DFT term is used to modify the "coding" applied to data symbols. Ex. E, cls. 1, 17. Finally, in the '792 Patent, the claimed "polyphase codes" must be "derived from" a DFT. Plaintiff fails to explain how the claimed "polyphase codes" can be derived from an algorithm for calculating a DFT, as opposed to the DFT itself. Thus, Plaintiff's proposed constructions are not consistent with the claim language.

*Third*, Plaintiff's singular one-sized fits all construction ignores differences in the specifications. The '227 Patent describes the benefits of using a "DFT matrix for CI spreading" to the exclusion of using "fast Fourier transform techniques for DFT processing." Ex. B, 65:5-10 ("While the use of fast Fourier transform techniques for DFT processing are well known, in the examples disclosed herein, a DFT matrix used for CI spreading . . . ."). The matrix "need not be constrained to powers of two"—which was a limitation on known fast algorithms. *Id.* The '227 Patent never describes a fast transform spreading matrix. The '568 Patent does not mention a fast Fourier transform or FFT at all and Plaintiff fails to explain why "complex-valued coefficients"

[2] This claim is indefinite for other reasons as explained below. Plaintiff's proposed construction exacerbates those reasons because it would require the matrix to comprise a variety of algorithms (instead of a transform), which also makes no sense.

must encompass coefficients of fast algorithms or even explain what that means. Yet, U.S. Patent Application No. 10/131,163 (issued as U.S. Pat. No. 7,430,257), which is incorporated by reference into the ’568 Patent, describes using FFTs. Ex. I, 125:24-26, 132:61-63. This difference shows an intention not to encompass fast algorithms. *Cf. DDR Holdings, LLC v. Priceline.com LLC*, 122 F.4th 911, 916 (Fed. Cir. 2024) (finding failure to include phrasing in later patent was “highly significant” in interpreting term found in later patent and finding deletion of material incorporated by reference in later document to indicate that the patentee intended to exclude the subject matter). The ’792 Patent does not describe “polyphase codes” from a fast algorithm and only describes “polyphase codes derived from a discrete Fourier transform.” Ex. H, 7:56-61.

*Fourth*, Plaintiff’s extrinsic evidence is flawed. None of it—including Dr. Goldberg’s declaration and the documents cited—addresses the meaning of “discrete Fourier transform” in the context the claim language. When viewed in the context of the claim language, the extrinsic evidence is not meaningful and should not be relied upon. *See Profectus Tech. LLC v. Huawei Techs. Co.*, 823 F.3d 1375, 1379 (Fed. Cir. 2016) (“Legal error arises when a court relies on extrinsic evidence that contradicts the intrinsic record.”). And, although the relevant time frame is the alleged time of invention, which Plaintiff alleges is between 1999 and 2003, Plaintiff relies on documents, including Samsung technical documents, that did not exist at the time of the alleged invention. *See Mass Inst. of Tech. v. Shire Pharms., Inc.*, 839 F.3d 1111, 1118 (Fed. Cir. 2016).

Finally, Plaintiff’s proposed construction offers no construction of the DFT or IDFT terms and instead asks this Court to rule as a matter of law that certain techniques are within the scope of a DFT. Even if Plaintiff was correct that each instance of DFT and IDFT encompassed fast algorithms for calculating the DFT and IDFT (which it is not), Plaintiff asks this Court to make a fact finding to improve its case not to resolve a claim construction dispute. This is improper and

invades the providence of the jury. *See Entropic Commc'ns, LLC v. Charter Commc'ns, Inc.*, No. 2:22-cv-125-JRG, 2023 U.S. Dist. LEXIS 109786, at *36-37 (E.D. Tex. Jun. 26, 2023) (difference between "DOCSIS MAC processor" and "DOCSIS controller" was a "factual question[] of infringement rather than any legal question for claim construction").

### B. **selectable subcarrier spacings** ('508 Patent, claims 1, 2, 17, 18; '005 Patent, claims 7, 19; '792 Patent, claims 2 (via 1), 9 (via 8))

| GenghisComm's Position | SEA's Position |
|---|---|
| Frequency separation between adjacent OFDM subcarriers that can be selected; the subcarrier spacing is the inverse of the OFDM symbol period | Plain and ordinary meaning[3] |

The words "selectable subcarrier spacing" have a plain and ordinary meaning that is readily understood. None of the passages of the specifications relied upon by Plaintiff use the phrase in an unconventional way or even elaborate or clarify its meaning. Dkt. 122 at 6-9. Plaintiff does not contend otherwise.

Plaintiff's proposed construction is flawed for multiple reasons. *First*, Plaintiff's proposal reads a requirement that the "subcarrier spacing is the inverse of the OFDM symbol duration" into the claims without basis in the intrinsic record. Absent a "clear intent" that the inventor intended to limit the term "selectable subcarrier spacing" in this fashion, "it would be incorrect to import limitations into the claims . . . ." *See SQWIN SA v. Walmart Inc.*, No. 4:22-cv-1040-SDJ, 2023 U.S. Dist. LEXIS 218845, at *31 (E.D. Tex. Dec. 8, 2023). Plaintiff does not identify any

[3] Given the parties have now agreed that the term "subcarrier" should be given its plain and ordinary meaning (Dkt. 121 at 1-2), SEA's reference to "*see* 'subcarrier' as construed above" in its position for this term (Dkt. 121-1 at 4) is moot. Samsung reserves the right to rely on any of the intrinsic or extrinsic evidence it identified for the term "subcarrier." Dkt. 76-1 at 12-16.

disclaimer—in the specification or otherwise—which would necessitate requiring the plain English phrase "selectable subcarrier spacing" to be "the inverse of the OFDM symbol duration."[4]

*Second*, Plaintiff's proposed construction finds no support in the claim language, and the one-size-fits-all nature of the proposal is contradicted by differences in claim language. It is axiomatic that "the claims themselves provide substantial guidance as to the meaning of particular claim terms." *Phillips*, 415 F.3d at 1314. Here, the phrase "selectable subcarrier spacing" appears in claims 1, 2, 17, and 18 of the '508 Patent; claims 7 and 19 of the '005 Patent; and claims 1, 2, 8, and 9 of the '792 Patent. Claims 7 and 19 of the '005 Patent do not even mention "symbol duration," while claims 1 and 17 of the '508 Patent refer to "symbol periods." Ex. E, cl. 7, 19; Ex. F, cl. 1, 17. Where the inventor did not want to include any limitations about symbol periods, he chose not to. These choices regarding claim language should not be ignored. *See Nystrom v. TREX Co*., 424 F.3d 1136, 1143 (Fed. Cir. 2005) ("When different words or phrases are used in separate claims, a difference in meaning is presumed."). And, even when "symbol periods" were claimed, the phrase "subcarrier spacing" does not require the spacing to be "the inverse of the OFDM symbol duration." Ex. F, cl. 1, 17.

*Third*, the intrinsic evidence Plaintiff cites does not indicate that the subcarrier spacing is the inverse of the OFDM symbol period. The passages from the specifications that Plaintiff quotes do not even mention that concept (Dkt. 122 at 6-7), and Plaintiff's contention that claim 5 of the

---

[4] This language was not found in the Joint Claim Construction Chart filed July 29, 2025 nor was it discussed in Dr. Goldberg's declaration served on that deadline. Dkt. 76-1. Plaintiff changed its construction and provided an additional, untimely expert declaration addressing this additional phrase on September 24, 2025 without leave of Court. Dr. Goldberg's untimely opinions about this term from his September 24, 2025 declaration should not be considered. But, in any event, Dr. Goldberg has not explained why the phrase "selectable subcarrier spacing" requires the additional limitation not found in the claims and his opinions cannot be used to alter the claim language. *Profectus*, 823 F.3d at 1380 ("Extrinsic evidence may not be used to contradict claim meaning that is unambiguous in light of the intrinsic evidence.").

’005 Patent supports its construction (*id*. at 8) misinterprets that claim. Claim 5 of the ’005 Patent is not referring to subcarrier spacings and instead refers to the periodicity of “cyclic-shifted waveforms,” which are produced by shaping interference patterns of a time-domain superposition of modulated subcarriers. Ex. F, cls. 1, 5. This is not relevant to the construction of selectable subcarrier spacings.

The parties agree that “subcarrier” should get its plain and ordinary meaning. Nothing about the words “selectable” or “spacing” need construction and cannot support adding unstated limitations to the claims. Thus, this term should receive its plain and ordinary meaning.

**C. spread / spreading** (’842 Patent, claim 1; ’227 Patent, claims 18, 21 (via 11), 24-25 (via 22); ’568 Patent, claims 2, 6, and 9 (via 1), 11 (via 1), 25; ’786 Patent, claims 2, 6, and 8 (via 1), 11, 15, 17 (via 10))

| GenghisComm’s Position | SEA’s Position |
|---|---|
| Use of/ using frequency domain codes to expand (spread) a data symbol over multiple subcarriers | Plain and ordinary meaning |

The words “spread” and “spreading” need no construction and should instead be given their plain and ordinary meaning. Plaintiff’s proposal equates the word “spread” with “expand.” But it also adds unclaimed requirements about “use of” [sic] or “using” “frequency domain codes.” This is not only improper but will just add confusion. Some claims already define what is used to spread data symbols and no claim uses the phrase “frequency domain codes”:

| | |
|---|---|
| **’842 Pat., cl. 1:** | “*spread* a plurality of data symbols *with Fourier coefficients*” |
| **’568 Pat., cls. 2 & 25:** | “*spreads* the block of complex-valued symbols *with a plurality of orthogonal spreading codes comprising complex-valued coefficients of a discrete Fourier transform*” |

Other claims use “spreading” or “spread” to describe a thing—e.g., “a complex valued spreading matrix” or “a spread-Orthogonal Frequency Division Multiplexing (OFDM) signal.” Once again, Plaintiff’s one-size-fits-all proposed construction does not account for the differences

in usage in the claims. Plaintiff cites no instance in which the specifications describe "spreading" as requiring the use of "frequency domain codes" (whatever that means). Thus, Plaintiff's proposed construction would have the Court engraft a concept into the claims that is not required by the claim language or described in the specification. Plaintiff's proposed construction should not be adopted because it is inconsistent with the intrinsic evidence.

### D. **at least one of known training symbols and synchronization symbols** ('842 Patent, claim 4)

| GenghisComm's Position | SEA's Position |
|---|---|
| Plain and ordinary meaning to POSITA<br><br>(claim requires one or the other) | at least one of known training symbols and at least one of known synchronization symbols. |

The proper construction of this phrase is "at least one of known training symbols and at least one of known synchronization symbols" because the phrase "at least one of" modifies both "training symbols" and "synchronization symbols." *See SuperGuide Corp. v. DirectTV Enters., Inc.*, 358 F.3d 870, 886 (Fed. Cir. 2004). The '842 Patent is in accord because it describes transmitting both training symbols and synchronization (pilot) symbols. Ex. A, 21:48-56 ("For example, the '850 application discloses that reference signals, which include known training sequences and pilot signals, are transmitted . . . ."); Ex. K, U.S. Provisional Application No. 60/286,850, p.25 ("The invention anticipates the use of known training sequences and pilot signals . . . ."); Ex. A, FIG. 3A, 3B, 4A, 4B. Here, the phase "at least one of" proceeds a series of types of reference-signal symbols and "the patentee used the term 'and' to separate the" types of reference signal symbols, which "connotes a conjunctive list." *SuperGuide*, 358 F.3d at 886 (citing Willaim Strunk, Jr. & E. B. White, *The Elements of Style* 27 (4th ed. 2000)).

Plaintiff incorrectly argues that this claim is written as a *Markush* claim. Claim 4 is written with the open-ended word "comprise": "the data symbols comprise reference-signal symbols, which comprise at least one of known training symbols and synchronization symbols." Ex. A, cl.

4. A *Markush* claim, however, should be closed-ended and use the word "consisting of" or risk indefiniteness. *See Abbott Labs. v. Baxter Pharm. Prods.*, 334 F.3d 1274, 1280-81 (Fed. Cir. 2003); *In re Kiely*, No. 2022-1076, 2022 U.S. App. LEXIS 15693, at *4-5 (Fed. Cir. Jun. 8, 2022) ("A proper Markush claim incorporates a *closed* list of specified alternative limitations."). Thus, Plaintiff's citation to a regulation and Commissioner of Patents decision about *Markush* claims has no bearing on the meaning of this phrase and SEA's proposed construction should be adopted.

### E. a transceiver-control circuitry configured for: provisioning a consecutive series of Orthogonal Frequency Division Multiplexing (OFDM) subcarriers for uplink or downlink communications; provisioning a plurality of different selectable subcarrier spacings for the consecutive series of OFDM subcarriers ('508 Patent, claim 17)

| GenghisComm's Position | SEA's Position |
|---|---|
| Plain and ordinary meaning to POSITA | Plain and ordinary meaning, but the transceiver-control circuitry must be for provisioning a consecutive series of OFDM subcarriers for uplink or downlink communications before provisioning a plurality of different selectable subcarrier spacings for the consecutive series of OFDM subcarriers[5] |

Claims that do not otherwise recite an order may be limited to a particular order of steps if the claim language requires, as a matter of logic or grammar, that the steps must be performed in the order written. *Hytera Commc'ns Co. v. Motorola Sols., Inc.*, 841 F. App'x 210, 218 (Fed. Cir. 2021) ("When 'determining if the steps of a method claim that do not otherwise recite an order, must nonetheless be performed in the order in which they are written . . . [f]irst, we look to the claim language to determine if, as a matter of logic or grammar, they must be performed in the order written.'") (quoting *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1369 (Fed. Cir. 2003)). One example of a "matter of logic or grammar" involves determining whether an earlier step provides the antecedent basis for a later step. *See id.* at 218 (reasoning that the step of "determining

[5] Given the parties now agree that the term "subcarrier" should be given its plain and ordinary meaning (Dkt. 121 at 1-2), SEA's reference to "*See* 'subcarriers above" in its position for this term (Dkt. 121-1 at 16) is moot.

whether the timeslot is a current desired timeslot" must be performed after the step of "preparing to transmit a particular payload type in a timeslot" because of the antecedent basis the former provides the latter); *see also Medtronic, Inc. v. Teleflex Life Scis. Ltd.*, Nos. 2022-1605, 2022-1606, 2024 WL 1208642, at *3 (Fed. Cir. Mar. 21, 2024) ("Although not an ironclad rule, when the current step of a method claim refers to a previous step using the definite article 'the,' the claim language indicates that the previous step occurs sequentially before the current step.").

Here, the claim language at issue imposes a sequential order on the transceiver-control circuitry's intended operation. Specifically, the second provisioning step, "provisioning a plurality of different selectable subcarrier spacings for ***the*** consecutive series of OFDM subcarriers," relies on the definite article "the" to refer back to "a consecutive series of Orthogonal Frequency Division Multiplexing (OFDM) subcarriers" introduced in the first provisioning step for uplink or downlink communications. This grammatical structure establishes an antecedent basis that logically requires the initial provisioning of the subcarriers to occur before provisioning selectable subcarrier spacings for them, as the latter provisioning cannot meaningfully proceed without the former's defined reference. Thus, the transceiver-control circuitry must be configured to perform these actions in the order recited, based on the inference of order from claim grammar and logic.

This reading is consistent with the '508 Patent specification. For example, the abstract first describes "a consecutive series of [OFDM] subcarriers [being] provisioned for uplink or downlink communications" and only thereafter "a flexible frame structure [being] provided by provisioning different subcarrier spacings for the consecutive series of OFDM subcarriers." Ex. E, Abstract. The detailed description further explains that:

> based on a number of assigned OFDM subcarriers, an N×N complex spreading matrix can be selected in which the matrix-generation algorithm exploits the factorization of N. In some aspects, the number of assigned OFDM subcarriers equals N. In other aspects, a spreading matrix with dimension less than the number

> of assigned OFDM subcarriers might be selected, such as to facilitate spreading with a small sacrifice in data bandwidth, enable further PAPR reduction, or provide for other benefits.

*Id.* at 22:20-29; *see also id.* at 20:17-23, 25:43-55, 27:24-41, 27:58-28:18. These disclosures show that the '508 Patent first establishes the number and identity of the OFDM subcarriers before introducing flexibility in subcarrier spacing to provide a "flexible frame structure." *Id.* at Abstract. As such, the specification confirms that the second "provisioning" in claim 17 of the '508 Patent logically depends on the first, consistent with SEA's reading of the claim language as sequential.

### F. **provisioning** ('508 Patent, claims 1, 2 (via 1) 17, 18 (via 17))

| GenghisComm's Position | SEA's Position |
|---|---|
| Does not require construction, plain and ordinary meaning to POSITA<br><br>If construed, "preparing" | Plain and ordinary meaning with the understanding that provisioning is used consistently throughout the identified claims. |

Both parties agree that the word "provisioning" should get its plain and ordinary meaning. However, when SEA asked Plaintiff to explain whether "provisioning" should be interpreted consistently throughout the claims in which it appears, Plaintiff refused to take a position. SEA therefore asks that this Court construe "provisioning" as having a consistent meaning in the '508 patent claims because there is no reason to treat this term differently within the same claim.[6]

Independent claims 1 and 17 of the '508 Patent use the word "provisioning" in two limitations: (1) "***provisioning*** a consecutive series of [OFDM] subcarriers," and (2) "wherein ***provisioning*** the plurality of different selectable subcarrier spacings." Ex. E, cl. 1, 17 (claim 17 also includes the word "provision," which presents the same issue raised herein). "[T]he same word appearing in the same claim should be interpreted consistently." *Digital Biometrics, Inc. v.*

[6] Although the asserted claims of the '792 Patent include the word "provisioning," they do not require provisioning different things. The issue being presented by SEA is not present in the '792 Patent and the parties appear to agree that no construction is needed for "provisioning" in the context of the '792 Patent.

*Identix, Inc.*, 149 F.3d 1335, 1345 (Fed. Cir. 1998); *Phonometrics, Inc. v. N. Telecom Inc.*, 133 F.3d 1459, 1465 (Fed. Cir. 1998) ("A word or phrase used consistently throughout a claim should be interpreted consistently."). Consistent with this canon of construction, the word "provisioning" (and "provision" in claim 17) should be held to mean the same thing throughout the claims in which it appears, because there is no reason why it should mean one thing in the context of provisioning subcarriers and another thing in provisioning selectable subcarrier spacings. Even Plaintiff's declarant agrees that these terms are "used consistently" in the claims. Ex. 1, ¶79.

Plaintiff's alternative proposal that "provisioning" means "preparing" is not supported by the intrinsic record and is plucked from a dictionary definition that is at odds with the usage in the patent even though Dr. Goldberg makes the *ipse dixit* statement that it is consistent with the specifications. *Id.* at ¶83. Dr. Goldberg offers no support for his opinion. With the exception of the abstract, the word "provision[ing]" is not used in connection with subcarriers or subcarrier spacings in the '508 Patent. Instead, the patent refers to "assigned subcarriers," Ex. E, 4:17-18, 4:44 ("subcarrier assignment"), 21:58-61 ("assigned subcarriers"), and "allocated subcarriers," 23:29-37. Not once does the '508 Patent hint at "preparing" subcarriers or subcarrier spacings. Thus, Plaintiff's proposed construction is not the plain and ordinary meaning of "provisioning" in the context of the '508 Patent and is at odds with the patent specification which suggests that provisioning is an act of assignment or allocation (i.e., providing). Thus, Plaintiff's alternative proposed construction should be rejected.

### G. a mapper configured to map the DFT-spread data signal to a plurality of OFDM subcarriers ('842 Patent, claim 1)

| GenghisComm's Position | SEA's Position |
|---|---|
| Not indefinite;<br><br>Plain and ordinary meaning to POSITA | This term is not written to receive the benefit of 35 U.S.C. § 112(f).<br><br>The claimed mapper includes any circuit or software for performing the claimed function that is not the claimed "OFDM spreader" or "OFDM modulator."<br><br>This term is indefinite because it claims the invention functionally at a point of novelty. |

In the context of the '842 Patent, a "mapper" is (1) any circuit or software that can perform the claimed function of "map the DFT-spread data signal to a plurality of OFDM subcarriers," Ex. A, cl. 1, and (2) is distinct from the "OFDM spreader" and "OFDM modulator."

On the first issue, Plaintiff agrees with SEA that the claimed "mapper" is purely functional. Plaintiff admits that a "mapper" is "a component that maps," Dkt. 122 at 16, and that "the mapper is a functional block, either hardware or software, arranged to provide the mapping functionality," *id.* at 17. The '842 Patent was intentionally drafted to avoid imparting any structural limitations on "functional block[s]," such as the mapper. Ex. A, 8:63-64, 68:34-36, FIGS. 29A, 30A, 31. The '842 Patent tells a POSITA that any structure, software, or technique can be employed to implement the claimed "mapper." *Id.* at 9:40-51, 14:53-67, 68:37-40. For instance, the specification states that "an apparatus" may be implemented using "any specific structure, function, or both being disclosed herein," or using any "other structure, functionality, or structure and functionality in addition to or other than" those disclosed. *Id.* at 14:53-67. The claims allegedly cover "all modifications, equivalents, and alternatives" to what is disclosed.[7] *Id.* at 15:15-20, 76:37-77:4. The functional nature of the limitation was intentional, and as Dr. Mahon explains,

[7] That other patents may refer to a "mapper" is not meaningful here because of the way that the '842 Patent was drafted to avoid giving any structural bounds to the mapper.

this is how a POSITA would have understood the '842 Patent. Ex. 3, ¶¶47-51 ("anything that could do the mapping function is a 'mapper' whether its implemented in hardware, software, or using some other mechanism or manner that has not even been conceived of as of the earliest effective filing date . . . anything that serves the claimed functional capabilities is a 'mapper'"). And, there is no dispute that the mapper is a key aspect of the claimed invention. Ex. 3, ¶52.

On these facts, the purely functional nature of the mapper renders the claim indefinite. While Plaintiff argues that "[f]unctional claiming is allowed by statute," Plaintiff misses the point.[8] Dkt. 122 at 17. Before the 1952 Patent Act, the Supreme Court invalidated patent claims to functionally claimed apparatus limitations. *See Halliburton Oil Well Cementing Co. v. Walker*, 329 U.S. 1, 12 (1946) ("[I]f Walker's blanket claims be valid, no device to clarify echo waves, now known or hereafter invented, whether the device be an actual equivalent of Walker's ingredient or not, could be used in a combination such as this, during the life of Walker's patent."); *Gen. Elec. Co. v. Wabash Appliance Co.*, 304 U.S. 364, 371 (1938). In 1952 Congress adopted a "compromise solution" to limit the breadth of functional claim language "by restricting its scope to the structure disclosed in the specification and equivalents thereof." *Greenberg v. Ethicon Endo-Surgery, Inc.*, 91 F.3d 1580, 1582 (Fed. Cir. 1996). While there is no categorical bar to functional claiming, the Federal Circuit has observed that whether a functional claim limitation is indefinite is "highly dependent on context" and the patent drafter is in the best position to avoid "the ambiguities of a functional limitation." *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1255-1256 (Fed. Cir. 2008).

[8] Plaintiff's declarant, Dr. Goldberg, appreciates the fact that apparatus claims are not supposed to be functional. Ex. 1, ¶83 ("Apparatus claims are meant to describe structures not functions.").

The ’842 Patent crosses the line because of the way it was drafted. Indeed, Plaintiff repeatedly admits that the claimed “mapper” is purely functional and covers anything that maps whether it existed at the time of the alleged invention or anything that may be created at any time thereafter. This term thus renders the claims in which it appears (claim 1 and its dependent claims) indefinite. This case is like *Markem-Imaje Corp. v. Zipher Ltd.*, No. 07-cv-00006-PB, 2012 U.S. Dist. LEXIS 112502 (D. N.H. Aug. 9, 2012). In that case, the accused infringer argued that the functionally-defined “controller” (which was not subject to § 112(f)) was indefinite because the “purely functional claim language broadly and impermissibly ‘cover[s] any means which anyone may ever discover of producing the result.’ *In re Fuetterer*, 319 F.2d 259, 263 (C.C.P.A. 1963).” *Markem-Imaje*, 2012 U.S. Dist. LEXIS 112502, at *25. Because this term reflected “unbounded functional claiming” the POSITA “would not apprehend what additional structure was being claimed to enable the controller to accomplish the recited functions;” the claim was thus indefinite. *Id.* at *25-26.

This is also true here. The ’842 Patent tells a POSITA that blocks like the claimed mapper include any structure that could accomplish the claimed result of mapping whether existing at the time of the alleged invention or anytime in the future. Plaintiff agrees. Dkt. 122 at 17. Here, the inventor could have written the specification in a way to cabin the purely functional nature of the claim language and did the opposite. The inventor could have invoked §112(f) and chose not to. Thus, on these facts, the “mapper” term renders the claims indefinite.

As to the second issue, the “mapper” is distinct from the “OFDM spreader” and the “OFDM modulator.” This conclusion follows from the claim language. According to claim 1, “an OFDM spreader” generates a DFT-spread data signal. After that signal is generated, a “mapper” maps the generated signal to “a plurality of subcarriers.” Thus, “the logic of the claim tells the POSITA that

the DFT spreader, the mapper, and the OFDM modulator are distinct functional blocks and that the result of one block is used in the next block . . . .” Ex. 3, ¶42. SEA’s proposed construction also flows from the specification, which shows distinct spreading, mapping, and modulating blocks with one feeding into the next. Ex. A, FIGS. 29A, 30A, 31, 77:10-15; Ex. 3, ¶¶44-45.

Plaintiff erects two strawman arguments. First, Plaintiff contends that SEA’s construction precludes “sharing” of “any circuit or software.” Dkt. 122 at 18. That is not what SEA’s construction says. Instead, SEA’s position is that the mapper is “not the claimed ‘OFDM spreader’ or ‘OFDM modulator.’” Second, Plaintiff contends that because the “OFDM spreader,” the “mapper,” and the “OFDM modulator” can be part of the same structure like a memory or transmitter, SEA’s construction must be wrong. Dkt. 122 at 19. But SEA’s proposed construction does not preclude the mapper, spreader, and modulator from being in the same apparatus; it merely requires them to be distinct portions of the apparatus just as they are recited in the claims.

### H. Preambles of claims 1 and 10 of the '786 Patent

| Exemplary Claim Language | GenghisComm's Position | SEA's Position |
|---|---|---|
| **<u>Claim 10</u>:** An apparatus for communication in a wireless communication network that employs a first set of complex-valued codes to encode data symbols to be transmitted, and employs a second set of complex-valued codes to recover transmitted data symbols from a received signal, . . .<br><br>encoding the data symbols with the first set of complex-valued codes to produce encoded data symbols;<br>. . .<br>wherein the first set of complex-valued codes are complex conjugates of the second set of complex-valued codes. | Plain and ordinary meaning to POSITA | The preamble is a limitation.<br><br>The apparatus employs a first and second set of complex-valued codes as recited in this claim. |

The preambles of claims 1 and 10 are limiting and, based on rules of grammar and confirmed in the '786 Patent specification, they are directed to a method (claim 1) and apparatus (claim 10) that employ both first and second complex-valued codes.

The lengthy preambles are limiting because (1) they provide antecedent basis for limitations appearing later in the claim, and (2) without the preambles the claims fail to provide a complete invention. The Federal Circuit has "repeatedly held a preamble limiting when it serves as antecedent basis for a term appearing in the body of a claim." *In re Fought*, 941 F.3d 1175, 1178 (Fed. Cir. 2019). Here, the body of the claim relies on antecedent basis provided by the preamble in two respects. First, the preamble introduces the concept of "data symbols to be transmitted" and then recites "encoding *the* data symbols . . . to produce encoded data symbols." Ex. D, cls. 1, 10. Second, the preamble introduces "a first set of complex-valued codes" and "a second set of complex-valued codes," and then the body of the claim requires "*the* first set of complex-valued codes are complex conjugates of *the* second set of complex-valued codes." *Id.* Thus, the preambles are used to provide antecedent basis in two respects for limitations found in

the claims. And, the preambles are needed to provide a complete invention. If the preambles had no impact on the scope of the claims, the last limitation of the claim would lack any context. It would merely say that the "first set of complex-valued codes are complex conjugates of the second set of complex-valued codes" without tethering the second set of complex-valued codes to anything whatsoever. Yet, in the context of the preambles, the first and second set of complex-valued codes are employed for transmission and reception of data symbols, respectively. Plaintiff attempts to fill this gap by saying that "[t]he second set of codes is employed by a different apparatus – a receiver – in the network." Dkt. 122 at 21. So does its declarant. Ex. 1, ¶95 ("The wireless communications network uses the second set of complex-valued codes to recover (decode) data symbols in received communications."). The preamble thus provides necessary context for the "second set of complex-valued codes" used in the body of the claims.

Grammatically, the phrase "that employs … to encode . . ., and employs . . . to recover" functions as a restrictive clause modifying the "method" and "apparatus" recited in "[a] method of communication in a wireless communication network" and "[a]n apparatus for communication in a wireless communication network" not as a mere purpose clause. William Strunk, Jr. & E.B. White, *The Elements of Style* 84 (4th ed. 2000) (defining a restrictive clause as one that "limits the essential meaning of the sentence element it modifies or identifies"). This grammatical rule is consistent with the claim language because it is not the "wireless communication network" that employs both the first and second sets of complex-valued codes, but instead is the claimed method and apparatus because the claim expressly recites "encoding" using the "first set of complex-valued codes" within the body of the claim. Ex. D, cls. 1, 10. It is not the wireless communication network that is claimed as employing both the first and second sets of codes, it is the method and apparatus "that employ" such codes.

This understanding of the claim language is also supported by the rest of the specification which describes a "transceiver"—i.e., a device that includes both a transmitter and a receiver. Ex. D, 12:49, 12:57, 17:51-55, 151:51-52, 151:64-152:7, 152:8-67, 153:5-18, FIGS. 40A, 42, 98, 99, 103A-C, 109A-B, 110A-B. The preamble requires a method/apparatus "that employs" a first set of complex-valued codes to encode data symbols to be transmitted and a second set of complex-valued codes to receive transmitted data symbols from a received signal. By referring to "a received signal"—without using an antecedent—the applicant indicated that the claims were directed to methods and apparatus involved in both transmission and reception. Reflecting the claim language, the '786 Patent explains that a transceiver includes "[a] receiver system [that] couples a transmitted signal out of a communication channel" and "[a] transmitter system [that] couples an information-bearing transmit signal into a communication channel." *Id.* at 17:51-55, FIGS. 98, 99, 103A-C.

Thus, both the claim language and the specification confirm that the preambles define essential structural and functional relationships between codes for both encoding and recovery within each transceiver. Therefore, not only is the preamble a limitation, but based on the way it is written, the method and apparatus are methods and apparatuses that employ first and second sets of complex-valued codes as SEA proposes.

### I. **further comprising adding a cyclic prefix to the time-domain waveform** ('285 Patent, claims 7 and 17)

| **GenghisComm's Position** | **SEA's Position** |
|---|---|
| Does not require construction, plain and ordinary meaning to POSITA | a cyclic prefix is added to the time-domain waveform that comprises a superposition of the plurality of modulated subcarriers |

The dispute here is whether "the time domain waveform" found in the dependent claims refers to the "time-domain waveform that comprises a superposition of the plurality of subcarriers" recited in the independent claims. While Plaintiff alleges that SEA has not explained its position,

not only is that incorrect, it is Plaintiff that has refused to take a position on the matter. Although Plaintiff acknowledges that "the 'time-domain waveform' is clearly identified in the respective independent claims" (Dkt. 122 at 23), and the independent claims recite "a time-domain waveform that comprises a superposition of the plurality of modulated subcarriers," Ex. G, cl. 1, 11, Plaintiff refuses to take a position on whether "the time-domain waveform" referenced in the dependent claims "comprises a superposition of the plurality of modulated subcarriers."

Because Plaintiff is noncommittal on the meaning of this phrase, this Court should construe the term as a matter of law by the simple application of antecedent basis rules as applied to the claim language. *See, e.g.*, *Wi-LAN, Inc. v. Apple Inc.*, 811 F.3d 455, 462 (Fed. Cir. 2016) ("Subsequent use of the definite articles 'the' or 'said' in a claim refers back to the same term recited earlier in the claim."). The jury should not be left to invoke this canon of claim construction. Here, "the time-domain waveform" in dependent claims 7 and 17 refers to "a time-domain waveform that comprises a superposition of the plurality of modulated subcarriers" as recited in independent claims 1 and 11. Ex. G, cl. 1, 7, 11, 17. This is all SEA proposes and it is at a loss why this is disagreeable to Plaintiff.

### J. **a first of the set of data symbols / a second of the set of data symbols** ('285 Patent, claims 7, 9 (via 1) and 17, 19 (via 11))

| GenghisComm's Position | SEA's Position |
|---|---|
| Plain and ordinary meaning to POSITA | A first data symbol of the set of data symbols; A second data symbol of the set of data symbols. |

These phrases should be clarified to recite the implicit noun that is missing from the phrase "a first of" and a "second of"—i.e., that these refer to a first data symbol and a second data symbol of the set of data symbols as SEA proposes.

The claim language supports SEA's proposed construction. The claims recite "encoding a set of data symbols" to "produce a set of subcarrier values," "wherein the set of subcarrier values comprises a first polyphase code that encodes a first of the set of data symbols and at least a second polyphase code that encodes at least a second of the set of data symbols." Ex. G, cls. 1, 11. That the phrases "a first of the set" and "a second of the set" refer to a first and second data symbol of the set of data symbols is apparent from the specification of the '285 Patent. FIG. 29B shows a set of data symbols as $d_1()$, $d_2()$, $d_3()$, . . . $d_N()$ and the polyphase codes are shown as, *e.g.*, column 2951. Ex. G, FIG. 29B, 68:8-15. The '285 Patent explains that "each column of the CI code matrix (such as column 2951) is multiplied by *a corresponding data symbol* (such as symbol d2)." *Id.* at 68:13-15. Thus, each symbol (e.g., $d_2$) of the set of data symbols ($d_1()$, $d_2()$, $d_3()$, . . . $d_N()$) is multiplied by a polyphase code (e.g., column 2951) to generate subcarrier values—called "weights" ($w_1$, $w_2$, $w_3$, . . . $w_N$). *Id.* at 68:8-10.




Plaintiff does not disagree with the substance of SEA's proposed construction, but instead merely contends that it is unnecessary. But, as is apparent from the clunky claim language itself, clarity will be helpful to the jury to answer the question "at least a first" and "at least a second" of what of the set of data symbols? SEA's proposed construction should thus be adopted.

### K. wherein the spreading matrix comprises an N-point Discrete Fourier Transform (DFT) ('227 Patent, cl. 18)

| GenghisComm's Position | SEA's Position |
|---|---|
| Does not require construction; plain and ordinary meaning to POSITA<br><br>not indefinite | The full scope of the claim is not reasonably certain and thus this phrase renders the claim indefinite because this claim is nonsensical. |

The phrase "wherein the spreading matrix comprises an N-point Discrete Fourier Transform (DFT)" does not make sense. And because this claim is nonsensical, it is indefinite. Claim 18 of the '227 patent recites:

> 18. The method recited in claim 11, *wherein the spreading matrix comprises an N-point Discrete Fourier Transform (DFT)*, and the modulating comprises employing an M-point inverse-DFT, and wherein N<M.

The term "the spreading matrix" finds its antecedent basis in independent claim 11, which recites a method that involves "performing an *invertible transform*, comprising *multiplying a plurality of data symbols by <u>a complex-valued spreading matrix</u>* to produce a plurality of spread symbols." Ex. B, cl. 11.

A discrete Fourier transform is a type of transform used to convert a series of discrete data points from a time domain signal into its respective frequency components. Ex. 4 (Mahon Supp. Decl.), ¶18. The DFT is invertible, meaning that it has a mathematical inverse. *Id*. As the plain language of claim 11 mandates, performance of the "invertible transform" involves "multiplying a plurality of data symbols by [the] *spreading matrix* to produce a plurality of spread symbols." *Id*. at ¶19; Ex B, cl. 11.

The '227 Patent's specification describes the matrix multiplication recited by claim 11. FIG. 31 shows a "Spread-DFT source code segment 3102." Ex. B, 73:37. This "source code segment 3102 can be configured to perform an N-point DFT to produce frequency-domain symbols which are the DFT-spread input symbols b." *Id*. at 73:40-43. "FIG. 32 illustrates an

invertible transform matrix S," which may be "an NxN DFT matrix." *Id*. at 73:48-51. "Each row (e.g., row 3201) of the matrix S multiplies original data vector b (which comprises N values) to produce a coded data symbol $x_i$." *Id*. at 73:51-53.

Dr. Mahon used an equation to explain how a POSITA would understand the matrix multiplication required by claim 11. He opined that, "[s]tated in the context of claim 11, the equation 'x=Sb' represents the claimed 'invertible transform' because it comprises 'multiplying a plurality of data symbols' (e.g., original data vector 'b') 'by a complex spreading matrix' (e.g., 'invertible transform matrix S')." Ex. 4, ¶21. In other words, the claimed "invertible transform" represents the entire equation, and the "spreading matrix" is one of the things multiplied (by the data symbols) to perform the transform.

As Dr. Mahon explains, claim 18 is nonsensical to a POSITA because it requires that the "spreading matrix"—one of the things being multiplied to perform the "invertible transform"—comprises the "transform" itself (while also limiting the transform to a specific type of transform, an "N-point Discrete Fourier Transform (DFT)"). Ex. 4, ¶21. Put differently, claim 18 requires insertion of a "transform" (an equation) into a sub-component (the "spreading matrix") used to perform the equation. Dr. Mahon opined that "[t]his is fundamentally wrong on a mathematical basis and conceptually nonsensical from a signal processing perspective." *Id*. at ¶23. It "cannot be performed using a standard matrix or vector product as used to perform an N-point DFT via matrix multiplication," "[i]t is dimensionally incorrect," and the result of the operation would not be "to produce a plurality of spread symbols," as required by claim 11. *Id*. The disputed phrase "wherein the spreading matrix comprises an N-point Discrete Fourier Transform (DFT)" therefore renders claim 18 nonsensical, inoperable, and indefinite. *See Trs. of Columbia Univ. in City of New York v. Symantec Corp.*, 811 F.3d 1359, 1367 (Fed. Cir. 2016) ("The claims are nonsensical in the way

a claim to extracting orange juice from apples would be, and are thus indefinite."); *Allen Eng'g Corp. v. Bartell Indus.*, 299 F.3d 1336, 1349 (Fed. Cir. 2002) ("Accordingly, we conclude as a matter of law that claims 1-4 and 13, which include the incorrect 'perpendicular' limitation, are invalid under § 112, paragraph 2.").

Plaintiff does not dispute Dr. Mahon's opinions, other than to argue that he "created an extensive math problem with numerous embedded assumptions . . . many of which are improperly limiting or incorrect." Dkt. 122 at 26-27. Instead, laying bare the problem with claim 18, Plaintiff argues that "a DFT matrix can be . . . a spreading matrix." *Id.* at 27. But claim 18 does not call for a "DFT matrix" (which may be used to represent a part of a DFT) and it would be improper to rewrite the claim to recite "DFT matrix" instead of the claimed "N-point discrete Fourier transform." *Synchronoss Techs., Inc. v. Dropbox, Inc.*, 987 F.3d 1358, 1366-67 (Fed. Cir. 2021) (finding claim nonsensical and refusing to rewrite claims because "it is not our function to rewrite claims to preserve their validity"). Because the claim as written is nonsensical, it is invalid as indefinite.

### L. **User Equipment** ('227 Patent, claims 21, 24)

| **GenghisComm's Position** | **SEA's Position** |
|---|---|
| Does not require construction, plain and ordinary meaning to POSITA<br><br>If construed: a subscriber device, mobile terminal, user terminal, wireless terminal, subscriber terminal, client terminal, subscriber unit, mobile unit, subscriber device, mobile device, wireless device, client device, client terminal, client unit, mobile network device, mobile handset, wireless handset, or some other terminology indicating a WWAN-enabled client device. | Any device used directly by an end user (or client device) to communicate in a radio access network. "User Equipment" is defined as including any device that connects to a base station NodeB or eNodeB as specified in the ETSI 125/136-series and 3GPP 25/36-series of specifications. |

User Equipment ("UE") is defined in the specification of the '227 Patent. Ex. B, 13:12-51. Plaintiff admits as much but focuses only on part of the definition. Dkt. 122 at 28-29. The definition in the '227 Patent includes UEs described "in 3GPP technical specification (TS) 36.306, Release

8," which is "incorporated … by reference in its entirety." Ex. B, 13:49-51. The '227 Patent further acknowledges that "UE is defined" in "3GPP Long Term Evolution (LTE) as any device that connects to a base station NodeB or eNodeB as specified in the ETSI 125/136-series and 3GPP 25/36-series of specifications." *Id*. at 13:23-28.

When an inventor uses the specification to define a term used in the claims, that definition governs. *See Braintree Lab'ys, Inc. v. Novel Lab'ys, Inc.*, 749 F.3d 1349, 1356 (Fed. Cir. 2014) ("Under our precedent, the patentee's lexicography must govern the claim construction analysis."). Here, the '227 Patent reflects a clear intention to define the term "User Equipment." It states that "User Equipment (UE), *as used herein*," may encompass a variety of different types of devices including those explicitly disclosed in certain wireless standards. Ex. B, 13:49-51. *See Abbott Lab'ys v. Andrx Pharms., Inc.*, 473 F.3d 1196, 1210 (Fed. Cir. 2007) (finding specification "unambiguously provides definitions" for terms where it used the phrase "as used herein"); *Sony Interactive Ent. LLC v. Intell. Pixels Ltd*., No. 2022-2118, 2023 WL 6773879, at *4 (Fed. Cir. Oct. 13, 2023) ("The use of the phrase 'as used herein' signals that this sentence is definitional."); *Atos, LLC v. Allstate Ins. Co*., No. 2023-1621, 2025 WL 1482404, at *5 (Fed. Cir. May 23, 2025) (use of the phrase "as used herein" defined terms "clearly and explicitly"). The definition demonstrates an effort to capture subject matter that did not exist as of the '227 Patent's earliest effective filing date, as evidenced by its immediate parent application, which issued as U.S. Patent No. 9,819,449. The '449 Patent uses phrases like "cellular handsets" and "wireless mobile devices" rather than "User Equipment." *See* Ex. J., '449 Pat., 12:30-34. The differences between the earlier '449 Patent and the '227 Patents would be viewed by the POSITA as "highly significant" and as reflecting "an evolution of applicant's intended meaning," including its effort to capture technologies that were introduced after its originally claimed effective filing date. *DDR Holdings,* 122 F.4th at 916.

Plaintiff incorrectly accuses SEA of limiting UEs to the exemplary devices described in ETSI and 3GPP standards. SEA's proposed construction contradicts Plaintiff's position because under SEA's proposed construction "User Equipment" "is defined as *including* any device that connects to a base station NodeB or eNodeB as specified in the ETSI 125/136-series and 3GPP 25/36-series of specifications."

Finally, Plaintiff's alternate construction, taken from a portion of the specification indicating that, "[a]s used herein, a UE may *also* be referred to" as certain devices, is too narrow. Dkt. 122 at 28 (quoting '227 Patent at 13:28-37). That a "User Equipment" may "also" be referred to by different names does not mean it is limited to just those things. Instead, the '227 Patent clearly states that "User Equipment (UE), as used herein, . . . comprises any device used directly by an end user (or client device) to communicate in a radio access network," and that definition was written to expressly include any device that connects to a base station NodeB or eNodeB as specified in the ETSI 125/136-series and 3GPP 25/36-series of specifications (as well as equivalents). Ex. B, 13:11-51. Thus, SEA's proposed construction should be adopted.

### M. A User Equipment configured to perform the method recited in claim 11 ('227 Patent, cl. 21)

| GenghisComm's Position | SEA's Position |
|---|---|
| Does not require construction; plain and ordinary meaning to POSITA<br><br>not indefinite; claim 21 is an apparatus claim | The full scope of the claim is not reasonably certain and thus this phrase renders the claim indefinite because it recites an apparatus without any structure and/or is a mixed apparatus and method. |

Claim 21 of the '227 patent recites:

21. A User Equipment configured to *perform the method recited in claim 11*.

Ex. B, cl. 21. In successfully requesting permission to amend its infringement contentions to add method claims, Plaintiff identified claim 21 as a method claim:

The specifics of Plaintiff's proposal are below:

| | Apparatus | | Method | |
|---|---|---|---|---|
| | Originally Asserted Apparatus Claims | Reduced Apparatus Claims | Original Request in Motion: Method Claims to Add by Amendment | Proposal for Reduced Method Claims |
| 1. 11,252,005 | 13, 18, 19 | 19 | 1, 6, 7 | 7 |
| 2. 11,381,285 | 11, 17, 19 | 17, 19 | 1, 7, 9 | 7, 9 |
| 3. 11,424,792 | 8, 9, 10 | 9 | 1, 2, 3 | 2 |
| 4. 10,389,568 | 24,25,26,29,32,33,34,44 | 25,29,32,34 | 1, 2,3,6,9,10,11, 20 | 2,6,9,11 |
| 5. 11,075,786 | 10, 11, 15, 16, 17, 18 | 11, 15, 17 | 1, 2, 6, 7, 8, 9 | 2,6 and 8 |
| 6. 10,200,227 | 22, 24, 25, 26, 28 | 24, 25 | 11, 17, 18, 21 | 18, 21 |
| 7. 11,223,508 | 17, 18, 19, 20, 21, 22 | 17, 18 | | 1, 2 |
| TOTAL | 28 claims + 6 ('508 patent) | 13 claims + +2 ('508 patent) | 27 claims | 13 claims + 2('508 patent) |

Dkt. 63 at 3; *see also* Dkt. 52 at 2-3 (similar). Plaintiff now argues that "Claim 21 is an apparatus claim." Dkt. 122 at 29. GenghisComm's flip-flopping is understandable, as claim 21 mixes statutory classes: it purports to recite an apparatus yet depends from, and necessarily incorporates, method claim 11. This renders the claim indefinite. *See NetSocket, Inc. v. Cisco Sys., Inc.*, No. 2:22-cv-172-JRG, 2024 WL 5454527, at *26–28 (E.D. Tex. May 29, 2024).

The Court's decision in *NetSocket* decision is instructive. There, the claims recited:

> 41. A *computer program product stored on a computer usable medium*, comprising readable program for causing a processing means in an IP network, to control the execution of *the steps of claim 25.*
>
> 25. A *method* for reserving resources within an IP network to obtain a predetermined QoS between a source terminal within a source domain and a destination terminal within a destination domain, the method comprising the steps of:
>
> a first Network Resource Manager (NRM), located within said source domain, *requesting* ...
>
> the second NRM *announcing* ...
>
> the first NRM and the second NRM *performing* ...; and
>
> *using* an NRM path vector.

2024 WL 5454527, at *26 (emphasis in original). The Court found that claim 41 depends from claim 25, and that "[a] claim in dependent form *shall be construed* to incorporate by reference *all* the limitations of the claim to which it refers" *Id*. at *27 (quoting 35 U.S.C. § 112,

¶4) (emphasis in original). This created a "a direct conflict between whether Claim 41 is infringed by performing 'method' steps or instead is infringed by making, using, selling, or offering for sale a 'computer program product stored on a computer usable medium.'" *Id.*

The same result follows here. Because claim 21 depends from and, thus, incorporates by reference a method as recited in claim 11, claim 21 necessarily includes claim 11's limitations requiring "*[a] method*" that includes the steps of "*performing* an invertible transform . . . ," "*mapping* the plurality of spread symbols . . . ," and "*modulating* the plurality of spread symbols . . . ." Ex. B, cls. 11, 21. This creates "a direct conflict between whether Claim [21] is infringed by performing 'method' steps or instead is infringed by making, using, selling, or offering for sale" a "User Equipment," which renders claim 21 indefinite. *NetSocket*, 2024 WL 5454527, at *27-28.[9]

Posing an additional problem, claim 21 includes no structural elements for performing what are otherwise method steps. In fact, all key limitations of the claims are purely functional, which is improper unless the special rules of construction set forth in 35 U.S.C. § 112(f) are invoked. And, that statute is not invoked here. While Plaintiff contends that that "User Equipment" is "a thing" it has no structural elements to define the allegedly new and nonobvious structures that perform the claimed features. This is problematic because the Federal Circuit has explained that "the patentability of apparatus or composition claims depends on the claimed *structure*, not on the use or purpose of that structure." *Catalina Mktg. Int'l v. Coolsavings.com, Inc.*, 289 F.3d 801, 809 (Fed. Cir. 2002). And, the purely functional language that defines how the UE is "configured" "broadly and impermissibly 'cover[s] any means which anyone may ever discover of producing"

[9] MPEP 2173.05(f) is inapposite because claim 21 does not recite a "product produced by a method of" another claim. Dkt. 122 at 29.

the claimed result. *Markem-Imaje*, 2012 U.S. Dist. LEXIS 112502, at *25 (quoting *In re Fuerrerer*, 319 F.2d 259, 263 (C.C.P.A. 1963)). Here, any UE that can perform the method steps recited in claim 11 would be covered by this claim, while the claim includes no structural limitations for implementing those steps. This is impermissible purely functional claiming.

Plaintiff offers no case law supporting its unusual style of claim drafting. Plaintiff instead incorrectly argues that "Samsung cannot meet its burden" due to "one-sided" expert testimony Dkt. 122 at 30. This argument lacks merit because the issues presented herein are purely legal and Dr. Goldberg has no expertise to bring to bear on the matters raised above. In fact, this Court has found indefiniteness without expert testimony when similar issues have been presented. *See, e.g.*, *NetSocket*, 2024 WL 5454527, at *27-28 (finding claims indefinite absent consideration of expert testimony); *Motion Games, LLC v. Nintendo Co.*, No. 12-cv-878, 2015 WL 11170167, at *3 (E.D. Tex. Jan. 16, 2015) (concluding that "expert evidence is not necessary" to find claims indefinite for impermissibly mixing statutory classes), *report and recommendation adopted*, 2015 WL 11170729 (E.D. Tex. Apr. 22, 2015); *H-W Tech., L.C. v. Overstock.com, Inc.*, 758 F.3d 1329, 1336 (Fed. Cir. 2014) (finding claim indefinite under *IPXL* absent discussion of expert testimony). But Dr. Goldberg did not opine on whether claim 21 mixed statutory classes: he was "told by GenghisComm's lawyers" it was "an apparatus claim." Ex. 2, ¶38. And, although Dr. Goldberg concluded that "'User Equipment' is a structural element (a thing)," he failed to identify any structure it possesses beyond being "configured to perform the method of '227 patent claim 11"—i.e., the purely functional limitations of the claims. *Id*. at ¶37.

## IV. CONCLUSION

For the foregoing reasons, SEA respectfully requests that the Court adopt its proposed constructions.

Dated: October 15, 2025

By: <u>*/s/ Andrew R. Sommer*</u>

Melissa R. Smith
State Bar No. 24001351
Email:
melissa@gillamsmithlaw.com
GILLAM & SMITH, LLP
303 S Washington Avenue
Marshall, TX 75670
Telephone: (903) 934-8450
Facsimile: (903) 934-9257

Richard Edlin, NY2051696
Email: edlinr@gtlaw.com
Thomas D. Pease NY2671741
Email: thomas.pease@gtlaw.com
Elana B. Araj, NY5280565
Email: elana.araj@gtlaw.com
GREENBERG TRAURIG, LLP
One Vanderbilt Ave
New York, NY 10017
Telephone: (212) 801-9200
Facsimile: (212) 801-6400

Andrew R. Sommer
Virginia Bar No. 70304
Email: sommera@gtlaw.com
GREENBERG TRAURIG LLP
1750 Tysons Boulevard, Suite 1000
McLean, VA 22102
Telephone: (703) 749-1300
Facsimile: (703) 749-1301

Matthew J. Levinstein, IL6300343
Email: levinsteinm@gtlaw.com
GREENBERG TRAURIG, LLP
77 West Wacker Drive, Suite 3100
Chicago, IL 60601
Telephone: (312) 456-1039
Facsimile: (312) 456-8435

Jared Lee (admitted pro hac vice)
Email: Jared.lee@gtlaw.com
GREENBERG TRAURIG, LLP
222 South Main Street, Suite 1730
Salt Lake City, UT 84101
Telephone: (801) 478-6948

Facsimile: (801) 478-6900

**Attorneys for Defendant Samsung Electronics America, Inc.**

**CERTIFICATE OF SERVICE**

I hereby certify that on the October 15, 2025, I caused the foregoing **DEFENDANT'S RESPONSIVE CLAIM CONSTRUCTION BRIEF** to be served on all parties in this action via the Court's CM/ECF system.

*/s/ Melissa R. Smith*
Melissa R. Smith