**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| GENGHISCOMM HOLDINGS, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CASE NO. 2:24-CV-00242-RWS-RSP |
| | § | |
| SAMSUNG ELECTRONICS AMERICA, INC. | § | |
| | § | |
| | § | |
| Defendant. | § | |
| | § | |

# CLAIM CONSTRUCTION ORDER

Before the Court is Plaintiff's Opening Claim Construction Brief (Dkt. No. 122) filed by Genghiscomm Holdings, LLC. Also before the Court is the Defendant's Responsive Claim Construction Brief (Dkt. No. 126) filed by Samsung Electronics America, Inc., along with Plaintiff's Reply Claim Construction Brief (Dkt. No. 133). Also before the Court is Plaintiff's Motion for Leave to Supplement the Claim Construction Record (Dkt. No. 137) and Defendant's Response thereto (Dkt. No. 140).

The Court held a hearing on November 5, 2025. Having considered the parties' briefing, submitted evidence, and having heard arguments from counsel, the Court resolves the disputes as ordered herein.

## I. BACKGROUND

Plaintiff alleges infringement of eight patents: U.S. Patent No. 9,768,842 ("the '842 Patent"); U.S. Patent No. 10,200,227 ("the '227 Patent"); U.S. Patent No. 10,389,568 ("the '568 Patent"); U.S. Patent No. 11,075,786 ("the '786 Patent"); U.S. Patent No. 11,223,508 ("the '508

Patent"); U.S. Patent No. 11,252,005 ("the '005 Patent"); U.S. Patent No. 11,381,285 ("the '285 Patent"); and the U.S. Patent No. 11,424,792 ("the '792 Patent") (collectively, "the Patents-in-Suit"). The Patents-in-Suit are generally in the field of cellular and wireless communication, and involve technologies for multi-user MIMO, transform precoding, and flexible OFDM communications.

The '842 and '227 Patents have the same title, "Pre-coding in multi-user MIMO," and share an Abstract that sets forth as follows:

> In a multi-user communication system, a pre-coder in a transmitter comprises a Discrete Fourier Transform (DFT) spreader configured to spread data symbols with Fourier coefficients to generate DFT-spread data symbols. An OFDM modulator, such as an inverse-DFT, modulates the DFT-spread data symbols onto OFDM subcarriers to produce a pre-coded OFDM transmission signal. The DFT spreader is configured to reduce the transmission signal's peak to average power.

The '568 Patent is titled "Single carrier frequency division multiple access baseband signal generation" and its Abstract sets forth as follows:

> Applications of CI processing to ad-hoc and peer-to-peer networking significantly improve throughput, network capacity, range, power efficiency, and spectral efficiency. CI-based subscriber units perform network-control functions to optimize network performance relative to channel conditions, network loads, and subscriber services. CI codes are used to identify and address network transmissions. Channel characteristics of communication links are employed to encode, address, and authenticate network transmissions. CI transceivers used as relays and routers employ unique characteristics of transmission paths to code and decode network transmissions. A central processor is adapted to perform array processing with signals received from, and transmitted by, a plurality of subscriber units in a wireless network.

The '786 Patent is titled "Multicarrier sub-layer for direct sequence channel and multiple-access coding" and its Abstract sets forth as follows:

> Carrier Interferometry (CI) provides wideband transmission protocols with frequency-band selectivity to improve interference rejection, reduce multipath fading, and enable operation across non-continuous frequency bands. Direct-

> sequence protocols, such as DS-CDMA, are provided with CI to greatly improve performance and reduce transceiver complexity. CI introduces families of orthogonal polyphase codes that can be used for channel coding, spreading, and/or multiple access. Unlike conventional DS-CDMA, CI coding is not necessary for energy spreading because a set of CI carriers has an inherently wide aggregate bandwidth. Instead, CI codes are used for channelization, energy smoothing in the frequency domain, and interference suppression. CI-based ultra-wideband protocols are implemented via frequency-domain processing to reduce synchronization problems, transceiver complexity, and poor multipath performance of conventional ultra-wideband systems. CI allows wideband protocols to be implemented with space-frequency processing and other array-processing techniques to provide either or both diversity combining and sub-space processing. CI also enables spatial processing without antenna arrays. Even the bandwidth efficiency of multicarrier protocols is greatly enhanced with CI. CI-based wavelets avoid time and frequency resolution trade-offs associated with conventional wavelet processing. CI-based Fourier transforms eliminate all multiplications, which greatly simplifies multi-frequency processing. The quantum-wave principles of CI improve all types of baseband and radio processing.

The ’508 Patent is titled “Wireless communications using flexible channel bandwidth” and its Abstract sets forth as follows:

> The disclosure relates in some aspects to providing a flexible channel bandwidth in a mobile radio communications network. For example, wherein a consecutive series of Orthogonal Frequency Division Multiplexing (OFDM) subcarriers may be provisioned for uplink or downlink communications, a flexible frame structure may be provided by provisioning different subcarrier spacings for the consecutive series of OFDM subcarriers. The different subcarrier spacings may be used for transmitting and/or receiving OFDM signals.

The ’005 Patent is titled “Spreading and precoding in OFDM” and its Abstract sets forth as follows:

> An OFDM transmitter spreads original data symbols with a complex-valued spreading matrix derived from a discrete Fourier transform. Spread data symbols are mapped to OFDM subcarriers. Spreading and mapping are configured to produce a transmitted spread-OFDM signal with a low peak-to-average power ratio (PAPR) and orthogonal code spaces. In MIMO systems, the complex-valued spreading matrix can comprise a MIMO precoding matrix, and the code spaces can comprise MIMO subspaces. In Cooperative-MIMO, a combination of low code-space cross correlation and low PAPR can be achieved.

The ’285 Patent is titled “Transmit pre-coding” and its Abstract sets forth as follows:

> A user device communicates in a wireless network by encoding a set of data symbols with a set of complex-valued codes to produce a set of subcarrier values. The subcarrier values are modulated onto a set of Orthogonal Frequency Division Multiplexing (OFDM) subcarriers assigned to the user device to produce a time-domain waveform that comprises a superposition of modulated subcarriers, and the time-domain waveform is transmitted in the wireless network. The set of subcarrier values comprises a first polyphase code that encodes a first of the set of data symbols and at least a second polyphase code that encodes at least a second of the set of data symbols. The first polyphase code causes constructive and destructive interference between the modulated subcarriers to produce a first periodic pulse waveform having a peak value centered at a first time in an OFDM symbol interval, and the second polyphase code causes constructive and destructive interference between the modulated subcarriers to produce a second periodic pulse waveform having a peak value centered at a second time in the OFDM symbol interval, wherein the second time is different from the first time.

The ’792 Patent is titled “Coordinated multipoint systems” and its Abstract sets forth as follows:

> A flexible channel bandwidth for mobile radio communications is provided by provisioning a set of Orthogonal Frequency Division Multiplexing (OFDM) subcarriers for mobile radio communications; encoding data symbols with polyphase codes derived from a discrete Fourier transform to produce encoded data symbols; and modulating the encoded data symbols onto the OFDM subcarriers to produce a superposition signal that resembles a single-carrier signal and has one of a plurality of different symbol durations. The provisioning comprises selecting one of a plurality of different selectable subcarrier spacings, to provide for the one of the plurality of different symbol durations.

## II. LEGAL STANDARDS

“‘[T]he claims of a patent define the invention to which the patentee is entitled the right to exclude.’” *Phillips v. AWH Corp.,* 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*) (quoting *Innova/Pure-Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). “[T]he court has the power and obligation to construe as a matter of law the meaning of language used in the patent claim.” *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir.

1995) (*en banc*); *aff'g,* 517 U.S. 370, 390 (1996).

To ascertain the meaning of claims, courts look to three primary sources: the claims, the specification, and the prosecution history. *Markman*, 52 F.3d at 979. The specification must contain a written description of the invention that enables one of ordinary skill in the art to make and use the invention. *Id.* A patent's claims must be read in view of the specification, of which they are a part. *Id.* For claim construction purposes, the description may act as a sort of dictionary, which explains the invention and may define terms used in the claims. *Id.* "One purpose for examining the specification is to determine if the patentee has limited the scope of the claims." *Watts v. XL Sys., Inc.*, 232 F.3d 877, 882 (Fed. Cir. 2000).

When construing claims, "[t]here is a heavy presumption that claim terms are to be given their ordinary and customary meaning." *Aventis Pharm. Inc. v. Amino Chems. Ltd.,* 715 F.3d 1363, 1373 (Fed. Cir. 2013) (citing *Phillips,* 415 F.3d at 1312–13). Courts must therefore "look to the words of the claims themselves . . . to define the scope of the patented invention." *Id.* (citations omitted). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, *i.e.,* as of the effective filing date of the patent application." *Phillips,* 415 F.3d at 1313. This "person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.*

The patentee is free to be his own lexicographer, but any special definition given to a word must be clearly set forth in the specification. *Intellicall, Inc. v. Phonometrics, Inc.*, 952 F.2d 1384, 1388 (Fed. Cir. 1992). As the Supreme Court stated long ago, "in case of doubt or ambiguity it is proper in all cases to refer back to the descriptive portions of the specification to aid in solving the

doubt or in ascertaining the true intent and meaning of the language employed in the claims." *Bates v. Coe*, 98 U.S. 31, 38 (1878). Although the specification may indicate that certain embodiments are preferred, particular embodiments appearing in the specification will not be read into the claims when the claim language is broader than the embodiments. *Electro Med. Sys., S.A. v. Cooper Life Sciences, Inc.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994).

The prosecution history also continues to play an important role in claim interpretation. Like the specification, the prosecution history helps to demonstrate how the inventor and the United States Patent and Trademark Office ("PTO") understood the patent. *Phillips*, 415 F.3d at 1317. Because the file history, however, "represents an ongoing negotiation between the PTO and the applicant," it may lack the clarity of the specification and thus be less useful in claim construction proceedings. *Id.* Nevertheless, the prosecution history is intrinsic evidence that is relevant to the determination of how the inventor understood the invention and whether the inventor limited the invention during prosecution by narrowing the scope of the claims. *Id.*; *see Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1350 (Fed. Cir. 2004) (noting that "a patentee's statements during prosecution, whether relied on by the examiner or not, are relevant to claim interpretation").

Intrinsic evidence, therefore, is the primary resource for claim construction. *See Power-One, Inc. v. Artesyn Techs., Inc.,* 599 F.3d 1343, 1348 (Fed. Cir. 2010) (citing *Phillips,* 415 F.3d at 1312). But for claim terms with less-apparent meanings, courts consider " 'those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean[,] [including] the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art.' " *Phillips,* 415 F.3d at 1314

(quoting *Innova*, 381 F.3d at 1116). In those situations, "the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period." *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015) (citation omitted). "In cases where those subsidiary facts are in dispute, courts will need to make subsidiary factual findings about that extrinsic evidence. These are the 'evidentiary underpinnings' of claim construction that we discussed in *Markman*, and this subsidiary factfinding must be reviewed for clear error on appeal." *Id.* (citing 517 U.S. 370).

However, the intrinsic record may not be sacrificed in favor of extrinsic evidence. According to *Phillips*, reliance on dictionary definitions, for example at the expense of the specification had the effect of "focus[ing] the inquiry on the abstract meaning of words rather than on the meaning of claim terms within the context of the patent." *Id.* at 1321.

The Supreme Court of the United States has "read [35 U.S.C.] § 112, ¶ 2 to require that a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910, 134 S. Ct. 2120, 2129 (2014). "[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Id*. The claims "must be precise enough to afford clear notice of what is claimed," but that consideration must be made while accounting for the inherent limitations of language. *Id.* at 908. "Indefiniteness must be proven by clear and convincing evidence." *Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017).

## III. AGREED TERMS

The parties have not identified any agreed terms.

## IV. DISPUTED TERMS

### 1. "discrete Fourier transform" / "inverse discrete Fourier transform"

| Claim Term | Plaintiff's Construction | Defendant's Construction |
|---|---|---|
| "discrete Fourier transform"<br><br>"inverse discrete Fourier transform"<br><br>('227 patent, claims 18, 22)<br>('568 patent, claims 2, 25)<br>('508 patent, claims 1, 17)<br>('792 patent, claims 1, 8) | The Discrete Fourier Transform (DFT) and Inverse Discrete Fourier Transform (IDFT) include their respective calculation via a Fast Fourier Transform (FFT) and an Inverse Fast Fourier Transform (IFFT). | Plain and ordinary meaning |

The dispute as to this term is whether the Court should add clarification that the Discrete Fourier Transform (DFT) and Inverse Discrete Fourier Transform (IDFT) should include their respective Fast calculations, known as the Fast Fourier Transform (FFT) and the Inverse Fast Fourier Transform (IFFT).

Plaintiff contends that FFTs have long been used in the industry to compute the DFT, such that any implementation of DFT necessarily includes FFT. Plaintiff supports this position with multiple categories of evidence: The '227 and '508 Patent specifications that discuss FFT performing a DFT, Samsung's own patents and documents discussing FFT as a procedure for computing the DFT, its expert opinion about how Fast algorithms are a commonly employed real-time application for implementing DFT and IDFT, industry textbooks from 1975 and 1976, and widespread software applications including MATLAB, GNU Octave, and Python NumPy. Plaintiff further submitted supplemental authority for the industry understanding that FFT is a

standard implementation of DFT in the book, *The DFT An Owner's Manual for the Discrete Fourier Transform*, Soc'y for Indus. And Applied Mathematics (1995).

Defendant disagrees, arguing Plaintiff's proposed construction improperly injects unclaimed elements into the plain claim language and effectively rewrites the claims. Defendant contends that the patents claim a transform, which is a mathematical operation, and not the algorithms used as a shortcut to calculate the transform. According to Defendant, FFT is merely a computational shortcut or procedure for calculating the DFT, not the DFT itself, so including FFT in the construction of DFT would add limitation not present in the claim language. Defendant also argues that adding the Fast algorithm would not make sense in the context of certain claims. For example, Defendant notes that claim 18 of the '227 Patent recites "the spreading matrix comprises an N-point Discrete Fourier Transform (DFT)," which describes the DFT as a mathematical construct (a matrix) rather than as a computational process. According to Defendant, this claim language cannot logically encompass "calculation via FFT" because a matrix comprises coefficients, not a calculation method. Next, Defendant contends that Plaintiff's proposal is contradicted by the specifications of the '227 and '568 Patents, which Defendant argues either teach away from or intentionally exclude FFT from the claimed invention. Specifically, Defendant points to the '227 Patent specification at 65:5-10, which states: "While the use of fast Fourier transform techniques for DFT processing are well known, in the examples disclosed herein, a DFT matrix used for CI spreading (and a corresponding IDFT employed for CI de-spreading) can have matrix dimension N>2, but need not be constrained to powers of two." Defendant argues this passage demonstrates that the patentee deliberately avoided limiting the invention to FFT implementations (which typically require power-of-two dimensions). Defendant further argues that the '568 Patent specification's failure to mention FFT demonstrates intentional exclusion.

Lastly, Defendant contends that whether DFT/IDFT include their respective Fast calculations is a factual question of infringement properly reserved for the jury rather than resolved through claim construction.

At the claim construction hearing, Defendant acknowledged that it does not dispute the fact that DFTs can be, and typically are, calculated using Fast algorithms. However, Defendant maintains that the claim language deliberately omits any reference to FFT, and this omission by the patentee should be respected in the Court's construction.

The Court begins its analysis with a review of the claims in which the disputed term appears, as noted in bold below. Examination of the relevant claim language reveals that none of the asserted claims explicitly address whether DFT/IDFT includes fast calculation algorithms.

'227 Patent, Claim 18:

> "…wherein the spreading matrix comprises an N-point **Discrete Fourier Transform (DFT)**, and the modulating comprises employing an M-point inverse-DFT, and wherein N<M."

'227 Patent, Claim 22:

> "…perform an M-point **inverse discrete Fourier transform (IDFT)** on the set of complex subcarrier amplitudes to generate a time-domain sequence to be transmitted into a wireless channel…"

'568 Patent, Claims 2 and 25:

> "… wherein the transform precoding spreads the block of complex-valued symbols with a plurality of orthogonal spreading codes comprising complex-valued coefficients of a **discrete Fourier transform (DFT)** to produce the block of transform-precoded complex-valued symbols."

'508 Patent, Claim 1:

> "performing **discrete Fourier transform (DFT)** coding on a plurality of data symbols to produce coded symbols"

'508 Patent, Claim 17:

> “performing **discrete Fourier transform (DFT)** coding on a plurality of data symbols to produce DFT coded symbols”

’792 Patent, Claims 1 and 8:

> “encoding data symbols with polyphase codes derived from a **discrete Fourier transform** to produce encoded data symbols”

As shown, whether or not the DFT/IDFT includes their respective Fast calculations is not addressed in the claim itself. The claim language simply recites “discrete Fourier transform” and “inverse discrete Fourier transform” without specifying which method should be used to calculate it. The Fast algorithms are a method (one of many) of executing the underlying mathematical operation—a Fourier Transform that translates data from the time domain to the frequency domain, or the Inverse Fourier Transform that performs the inverse operation. Fast calculations represent optimized algorithms for executing underlying mathematical operations in signal processing applications. Because such implementation details are not inherently part of the mathematical transformations themselves, they ordinarily would not warrant inclusion in the Court’s construction. Nevertheless, where the intrinsic record demonstrates the inventor’s intent to include specific implementation methods, the Court should incorporate them into its construction. Here, claim language in a related patent provides clear evidence of the inventor’s intent to require the respective Fast algorithms.

Claim 26 of the ’842 Patent provides key insight into the inventor’s intent, and recites as follows:

> “The apparatus recited in claim 22, wherein **the IDFT comprises an inverse fast Fourier transform**.”

That claim depends from independent claim 22, which recites the term “IDFT,” and adds the limitation: “wherein the IDFT comprises an inverse fast Fourier transform. Under the doctrine of claim differentiation, the presence of this narrowing limitation in dependent claim 26

demonstrates that the broader term "IDFT" in claim 22 encompasses an inverse fast Fourier transform. *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1376 (Fed. Cir. 2014) ("Under the principles of claim differentiation, the independent claims are presumed to be broader."). Because claim 26 explicitly requires the Fast algorithm implementation, claim differentiation principles establish that the inventor intended "IDFT" to include inverse Fast Fourier transforms. This understanding of the inventor's intent applies equally to the construction of "discrete Fourier transform" in the asserted claims to include Fast Fourier transforms.

Claim 26 of the '842 Patent is instructive to this analysis because the '842 Patent (Application No. 15/283,881) is a cited reference in each of the disputed '227, '568, '508, and '792 Patents. Common terms in related patents should be construed consistently. *SightSound Techs., LLC v. Apple Inc.*, 809 F.3d 1307, 1316 (Fed. Cir. 2015). The '842 Patent's explicit requirement that "the IDFT comprises an inverse fast Fourier transform" therefore constitutes intrinsic evidence of the inventor's understanding of the term "IDFT" across the related patent family. Although the asserted claims do not expressly recite that the DFT/IDFT comprises Fast calculations, the explicit inclusion of IFFT as an implementation of IDFT in the related '842 Patent supports a construction that encompasses the respective Fast transforms.

At the hearing, Defendant attempted to distinguish claims 26 and 22 of the '842 Patent on the ground that those claims recite an apparatus "performing" an IDFT, which Defendant argues provides context for implementation using the Fast algorithm. Defendant contends that because the disputed claims use different language, the broader meaning informed by claim 26 should not apply. This argument is unpersuasive. First, half of the asserted claims themselves recite "performing" a DFT or IDFT, making them directly analogous to the '842 Patent claims. Second, regardless of the particular action verb employed, each asserted claim contemplates the use and

calculation of the mathematical operation in an operational context, not as an abstract mathematical concept divorced from implementation.

The Court next turns to examine the specification of each relevant Patent-in-Suit. The Court finds that each patent discloses the use of Fast Fourier Transform techniques for DFT processing, contrary to Defendant's assertion that the written descriptions exclude fast algorithms.

The '227 Patent specification contains multiple references to FFT implementation. At column 65, lines 5-10, the specification states:

> "While the use of fast Fourier transform techniques for DFT processing are well known, in the examples disclosed herein, a DFT matrix used for CI spreading (and a corresponding IDFT employed for CI de-spreading) can have matrix dimension N>2, but need not be constrained to powers of two."

Defendant argues this passage teaches away from using Fast calculations but such a reading is inaccurate. The specification establishes "the use of Fast Fourier transform techniques for DFT processing [as] well known." The statement that the matrix "can have" but "need not be constrained to powers of two"—a limitation on *some* known Fast algorithms—does not exclude Fast algorithms generally. Rather, it clarifies that the invention encompasses *both* certain Fast algorithm implementations and other methods. The fact that it need not be constrained to a power of two means that it can use this version of Fast calculations or some other method. It is an inclusive statement.

At column 72, lines 17-19, the specification explicitly states: "The FFT 3028 performs an M-point DFT once the CP has been removed." This language directly equates FFT performance with DFT performance. And at column 72, lines 48-49, the specification provides: "The processor performs an M-point inverse discrete Fourier transform, such as an inverse fast Fourier transform (IFFT)." The use of "such as" demonstrates that IFFT is an example of, and therefore contained within, IDFT.

Regarding the '568 Patent, Defendant argues that its failure to explicitly mention FFT demonstrates an intent to exclude Fast algorithms. This argument fails because the '568 Patent expressly incorporates by reference U.S. Patent Application No. 10/131,163 (issued as U.S. Patent No. 7,430,257), which describes using FFTs. Material incorporated by reference becomes part of the host patent's specification. *Advanced Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1282 (Fed. Cir. 2000) ("Material not explicitly contained in the single document can still constitute part of the specification if the single document incorporates the extrinsic material by reference."). The incorporated '257 Patent explicitly states at column 125, lines 24-27: "The principles described herein may be applied to or adapted to any of the fast Fourier transforms. The principles described herein may be applied to any inverse Fourier transform." (*See also id.* at 132:61-63.) This incorporated disclosure confirms that Fast Fourier transforms are within the contemplated embodiments of the '568 Patent.

Defendant cites *DDR Holdings, LLC v. Priceline.com LLC*, 122 F.4th 911, 916 (Fed. Cir. 2024), for the proposition that deletion of material incorporated by reference indicates intent to exclude subject matter. However, *DDR Holdings* is distinguishable and supports the opposite conclusion here. *DDR Holdings* involved words in a provisional application that were omitted in the final application, which directly contributed to narrowing the scope of the final application. Here, in contrast, the situation is reversed. The '568 Patent affirmatively incorporates by reference a document that describes FFT implementation, thereby bringing that disclosure into the specification.

The '508 and '792 Patents also contain discussions of the Fast transform. The '508 Patent specification states at column 19, lines 3-7:

> "A mapper 403 maps the spread data symbols to OFDM subcarriers, such as to input bins of an oversampled inverse discrete Fourier transform (IDFT) 404, which is typically implemented as an oversampled fast transform (e.g., an FFT)."

This passage explicitly describes IDFT as "typically implemented" using FFT, demonstrating that Fast algorithm implementation is not only contemplated but is the expected implementation. And the '792 Patent contains many discussions of FFT and IFFT in terms of modulation, converting between frequency and time domains. (*See, e.g.*,'792 Patent at 40:37-66.) Defendant argues that the '792 Patent only describes "polyphase codes derived from a discrete Fourier transform" without mentioning Fast algorithms. However, the absence of explicit FFT reference in describing polyphase codes does not exclude FFT implementation; it merely reflects that the specification describes the mathematical operation (DFT) from which the codes are derived, without limiting the method of implementation.

Thus, far from contradicting the use of the Fast algorithm as Defendant asserts, the written description of each patent supports the concept that Fast Fourier algorithms are well known techniques for DFT signal processing. The extrinsic evidence (including expert testimony, technical textbooks, and industry software documentation) uniformly establish that those of skill in the art understand FFT as a standard method for computing DFT. Defendant has introduced nothing to the contrary. Critically, Defendant has offered no expert opinion to challenge Plaintiff's position on this term. Samsung's expert, Dr. Mahon, provided no opinion on this term. The Court therefore has only one expert's view of how a skilled artisan would understand these terms, and that view supports FFT as a well-known implementation of DFT.

Though the DFT/IDFT comprising their respective Fast calculations is not expressly stated in the disputed claims, the intrinsic evidence weighs in favor of the inventor's intent for DFT/IDFT to include their respective Fast transforms and the extrinsic evidence reflects this understanding in

the art. The Fast algorithms are an implementation of the underlying mathematical operation. The intrinsic and extrinsic evidence demonstrates that those of skill in the art understand "discrete Fourier transform" and "inverse discrete Fourier transform" to include implementation via FFT and IFFT, respectively, among other possible implementations.

Defendant's argument that this is a factual question for the jury rather than claim construction also lacks merit. Claim construction is squarely within the province of the court. *Markman*, 52 F.3d at 979. The question here is not whether a particular accused device uses an FFT (which would be a question of fact), but rather whether the claim term "DFT" encompasses FFT as a matter of claim scope. That is a legal question of claim construction for this Court to resolve. *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) ("When the parties raise an actual dispute regarding the proper scope of these claims, the court, not the jury, must resolve that dispute.").

The Court therefore construes "discrete Fourier transform" and "inverse discrete Fourier transform" **to mean "the Discrete Fourier Transform (DFT) and Inverse Discrete Fourier Transform (IDFT) include a Fast Fourier Transform (FFT) and an Inverse Fast Fourier Transform (IFFT), respectively."**

**2. "selectable subcarrier spacing"**

| Claim term | Plaintiff's Construction | Defendant's Construction |
| --- | --- | --- |
| "selectable subcarrier spacings"<br><br>('508 Patent, claims 1,2, 17, 18)<br>('005 Patent, claims 7, 19)<br>('792 Patent, claims 1, 2, 8, 9) | Frequency separation between adjacent OFDM subcarriers that can be selected; the subcarrier spacing is the inverse of the OFDM symbol period | Plain and ordinary meaning |

Two questions must be decided regarding this term: (1) whether the frequency separation between adjacent OFDM subcarriers can actually be selected, and (2) whether the construction should include information about the subcarrier spacing being the inverse of the OFDM symbol period.

Regarding the first issue, Plaintiff argues that the relevant patent specifications make clear that subcarrier spacings are a selectable aspect of system operation because it is consistently identified as a subcarrier parameter that can be changed by the system to optimize communication. Plaintiff cites several specification passages in support.

Regarding the second issue, Plaintiff contends that subcarrier spacing must be inversely related to the OFDM symbol period based on both intrinsic and extrinsic evidence. First, Plaintiff points to claim 5 of the ’005 Patent, which states: “The method of claim 1, wherein the set of subcarriers have a frequency spacing fs, and the plurality of cyclic-shifted waveforms are each periodic over a symbol interval Ts=1/fs.” According to Plaintiff, this claim expressly establishes the inverse relationship between frequency spacing (fs) and symbol interval (Ts). Second, Plaintiff cites the ’257 Patent, which is incorporated by reference in both the ’005 and ’508 Patents, and which states at column 92, lines 35-37: “the normal symbol duration Ts=l/fs, where fs is the frequency separation between carrier frequencies.” Plaintiff also relies upon extrinsic evidence in the form of testimony from its expert witness and technical textbooks that describe the inverse relationship.

Defendant did not respond in its briefing to the first issue regarding whether the frequency separation between adjacent OFDM subcarriers can be selected.

On the second issue, Defendant argues that the Court should not add the inverse relationship limitation to the construction. Defendant contends there is no inventor disclaimer or

lexicography requiring the Court to define subcarrier spacing as the inverse of OFDM symbol duration. Defendant also argues that claim 5 of the ’005 Patent is irrelevant because it addresses “the plurality of cyclic-shifted waveforms” and not “selectable subcarrier spacing.” Defendant further argues that not all relevant claims include information about “symbol period” or “symbol duration.” Specifically, claims 7 and 19 of the ‘005 Patent do not mention “symbol duration” at all, while claims 1 and 17 of the ’508 Patent refer to “symbol periods” rather than “symbol duration,” and the different choice in words have different meaning. Defendant contends that adding the inverse relationship limitation across all claims would be improper because it would import a limitation into claims where the inventor chose not to include references to symbol timing.

The Court begins its analysis with an examination of the relevant parts of the claims in which the disputed term appears.

’508 Patent, claims 1 and 17:

> “provisioning a plurality of different **selectable subcarrier spacings** for the consecutive series of OFDM subcarriers . . . wherein provisioning the plurality of different **selectable subcarrier spacings** comprises providing the single-carrier frequency division multiple access signal with a particular one of a set of different symbol periods by selecting one of the plurality of different **selectable subcarrier spacings**.”

’508 Patent, dependent claims 2 and 18:

> “wherein at least one of the plurality of different **selectable subcarrier spacings** equals at least one other of the plurality of different **selectable subcarrier spacings** multiplied by a scaling factor that is a power of two.”

’005 Patent, dependent claims 7 and 19:

> “wherein selecting the set of subcarriers comprises selecting one of a plurality of **selectable subcarrier spacings**.”

’792 Patent claims 1 and 8:

> "wherein provisioning comprises selecting one of a plurality of different **selectable subcarrier spacings,** to provide for the one of the plurality of different symbol durations."

'792 Patent, dependent claims 2 and 9:

> "wherein at least one of the plurality of different **selectable subcarrier spacings** equals at least one other of the plurality of different selectable subcarrier spacings multiplied by a scaling factor that is a power of two."

On the first dispute of whether the subcarrier spacings can actually be selected, the answer is clearly yes from the plain claim language. The ability to select frequency spacings between subcarriers is explicitly set forth in the disputed phrase itself and is consistent with the context of the claim language. Not only does the disputed phrase answer this question inherently by being described as "selectable," several of the relevant claim elements further provide for "selecting . . . [the] selectable subcarrier spacings." The patent specifications further make clear that subcarrier spacings are a selectable aspect of system operation and Defendant has not advocated otherwise. (*See, e.g.,* '508 Patent at 20:20-23; '005 Patent at 24:50-57; '792 Patent at 42:51-54.) Thus, it cannot be reasonably disputed that the subcarrier spacings, or the frequency separation between adjacent OFDM subcarriers, can be selected.

As to the second dispute, Plaintiff urges that the construction should also specify that "the subcarrier spacing is the inverse of the OFDM symbol period." While this mathematical relationship may be true as a matter of OFDM theory, the Court declines to import this limitation into the claim language for several reasons.

First, nothing in the claim language mandates inclusion of the inverse relationship. The claims recite "selectable subcarrier spacings" without any explicit reference to an inverse relationship with symbol period or duration. Moreover, the claims treat symbol timing inconsistently across the Patents-in-Suit. Claims 7 and 19 of the '005 Patent omit any reference to

"symbol duration," while claims 1 and 17 of the '508 Patent refer to "symbol periods," which is terminology that typically denotes the time for one complete cycle of a waveform rather than an arbitrary temporal duration. "When different words or phrases are used in separate claims, a difference in meaning is presumed." *Nystrom v. TREX Co.*, 424 F.3d 1136, 1143 (Fed. Cir. 2005) (citation omitted). The inventor's deliberate choices made in selecting claim language, including where to impose timing-related limitations and where to omit them, must be respected and not rewritten through construction.

Plaintiff has not shown a clear and unmistakable disavowal or disclaimer that would require this limitation. Nor has Plaintiff identified any lexicography in the specification that defines "selectable subcarrier spacings" as including the inverse relationship. Absent a clear intent that the inventor intended to limit the term "selectable subcarrier spacing" in this fashion, it would be incorrect to import limitations into the claims.

Plaintiff relies heavily on claim 5 of the '005 patent, which states: "The method of claim 1, wherein the set of subcarriers have a frequency spacing fs, and the plurality of cyclic-shifted waveforms are each periodic over a symbol interval Ts=1/fs." But this reliance is misplaced. First, claim 5 is a separate dependent claim that depends from claim 1, just like claim 7 (which contains the disputed "selectable subcarrier spacings" term). That one dependent claim sets forth the inverse relationship between frequency separation and symbol duration does not necessarily mean the relationship exists in other dependent claims of this patent or in claims of other patents. Second, and more importantly, claim 5 is not about "selectable subcarrier spacing" at all. Instead, it is about "a frequency spacing fs" and sets forth the mathematical relationship of fs to the plurality of cyclic-shifted waveforms produced by the complex-valued codes provided in independent claim 1. This is not the same as, and is not relevant to, the construction of "selectable subcarrier spacings."

Plaintiff also points to the '257 Patent, which is incorporated by reference in the '005 and '508 Patents and describes an inverse relationship at column 92, lines 35-37: "the normal symbol duration Ts=l/fs, where fs is the frequency separation between carrier frequencies." However, merely describing a mathematical relationship in an incorporated specification does not require importing that relationship into the claim construction. The inverse relationship between frequency and time may well be a property of OFDM systems that those of ordinary skill in the art would understand, but general knowledge in the art does not justify reading limitations into claim language absent a clear indication that the inventor intended to impose such limitations. *See SQWIN SA v. Walmart Inc.*, No. 4:22-cv-1040-SDJ, 2023 U.S. Dist. LEXIS 218845at *31 (E.D. Tex. Dec. 8, 2023) (declining to import limitations absent "clear intent" from the inventor). Plaintiff has identified no inventor lexicography defining "selectable subcarrier spacings" to include the inverse relationship, nor has Plaintiff demonstrated a clear and unmistakable disclaimer requiring this limitation.

Plaintiff's expert testimony, while uncontested, does not overcome the absence of clear support in the claim language or specification for this limitation. Again, that a skilled artisan would understand subcarrier spacing to have an inverse relationship with symbol period as a matter of technical knowledge does not compel the Court to import this limitation into the claim construction. Claim construction serves to resolve disputes about claim scope based on the intrinsic evidence—not to explicate technical principles that skilled artisans would already understand as background knowledge. *See Phillips*, 415 F.3d at 1314 ("[T]he claims themselves provide substantial guidance as to the meaning of particular claim terms.") Where, as here, the claims do not recite the inverse relationship and the specification does not clearly define the term to include it, the Court declines to add such a limitation through construction.

The Court finds the term "selectable subcarrier spacings" to mean **"frequency separation between adjacent OFDM subcarriers that can be selected."**

**3. "spread" / "spreading"**

| Claim term | Plaintiff's Construction | Defendant's Construction |
|---|---|---|
| "Spread/spreading"<br><br>('842 Patent, claims 1, 2)<br>('227 Patent, claims 11, 18, 22)<br>('568 Patent, claims 1, 2, 24, 25)<br>('786 Patent, claims 1, 10, 18) | Use of/ using frequency-domain codes to expand (spread) each data symbol over multiple subcarriers | Plain and ordinary meaning |

The parties dispute whether the terms "spread" and "spreading" require construction and, if so, whether Plaintiff's proposed construction should be adopted.

Plaintiff argues that a construction is necessary to clear up any ambiguity for the jury between how these terms are used in the context of OFDM systems versus spread spectrum communications, which are undoubtedly different technologies. Plaintiff contends that persons of ordinary skill in the art understood "spreading" during the relevant time period to mean applying frequency-domain codes to expand data symbols across multiple OFDM subcarriers, as confirmed by Dr. Goldburg's expert declaration. To support this understanding, Plaintiff cites various industry texts for the proposition that DFT-spreading is well known, including a 3GPP technical specification from December 2005 and a 2007 IEEE article. Additionally, Plaintiff points to consistent usage throughout the Patents-in-Suit where the specifications describe CI coders providing DFT spreading, OFDM spreaders configured to spread reference signals with Fourier coefficients, and CI coding steps providing codes used to spread signals. According to Plaintiff, this consistent usage across all relevant patent specifications demonstrates that "spread" and

"spreading" refer to the use of frequency-domain codes to expand data symbols over multiple subcarriers in the OFDM context.

Defendant responds that the plain meaning of "spread" is sufficiently clear and that Plaintiff's proposal only adds confusion. In particular, Defendant contends that Plaintiff improperly equates "spread" with "expand," thereby altering the ordinary meaning of the term. More significantly, Defendant argues that Plaintiff seeks to add an unclaimed requirement that spreading must use "frequency-domain codes." Defendant points out that several of the claims already define what types of codes are used to spread the data symbols, so Plaintiff's blanket addition of "frequency-domain codes" is both unnecessary and improper. Defendant further argues that other claims use "spread" or "spreading" differently, as descriptive adjectives ("spreading matrix" or "spread OFDM signal") without explicitly requiring frequency-domain codes. Defendant contends that Plaintiff's proposal does not account for these varied uses of the term across different claim contexts and that Plaintiff's one-size-fits-all construction improperly narrows the claims beyond what the inventor claimed by importing limitations that are not present in the claim language itself.

The Court begins by examining the claims in which the disputed terms appear and notes that the words "spread" and "spreading" are used consistently throughout to explain the concept of distributing data onto multiple OFDM subcarriers to wirelessly transmit communications. As a representative example, claim 11 of the '227 Patent recites as follows, with the disputed term in bold:

> 11. A method, comprising:
>
> performing an invertible transform, comprising multiplying a plurality of data symbols by a complex-valued **spreading** matrix to produce a plurality of **spread** symbols;

> mapping the plurality of **spread** symbols to a plurality of Orthogonal Frequency Division Multiplexing (OFDM) subcarriers; and
>
> modulating the plurality of **spread** symbols onto the plurality of OFDM subcarriers to produce a **spread** OFDM signal to be transmitted into a wireless channel, wherein the **spread** OFDM signal comprises a superposition of the OFDM subcarriers, and wherein the complex-valued **spreading** matrix is configured to provide the superposition with a reduced peak-to-average power ratio (PAPR).

Similarly, claim 1 of the '842 Patent recites:

> 1. An OFDM transmitter, comprising:
>
> an OFDM spreader configured to **spread** a plurality of data symbols with Fourier coefficients to generate a discrete Fourier Transform (DFT)-**spread** data signal;
>
> a mapper configured to map the DFT-**spread** data signal to a plurality of OFDM subcarriers; and
>
> an OFDM modulator configured to modulate the DFT-**spread** data signal onto the plurality of OFDM subcarriers to produce an OFDM transmission signal comprising a superposition of the OFDM subcarriers, wherein the OFDM **spreader** is configured to provide the superposition with a reduced peak-to-average power ratio.

The Court finds that Plaintiff's proposed construction adds unnecessary limitations and redundancies. Taking each part of Plaintiff's proposal in turn, the Court first notes that the concept of distributing or spreading "data symbol[s] over multiple subcarriers" is already written in the claims themselves. Each claim using these terms does so in the context of OFDM subcarriers, making it clear that spreading involves multiple subcarriers. Adding this language to the construction would be redundant.

Second, Plaintiff provides no justification to change the claim terminology from "spread" to "expand." The inventor deliberately chose to use the word "spread" many times throughout the patent specification and claims. Having seen no evidence that the word is ambiguous in the OFDM

context, the Court is satisfied with its ordinary meaning and declines to define it as “expand.” The ordinary meaning of “spread” adequately conveys the concept without alteration.

Third, and most significantly, Plaintiff's proposal to add “use of/using frequency-domain codes” as a requirement for all instances of “spread” and “spreading” is problematic. Where the claims intend to specify particular codes used for spreading, they do so explicitly. For example, claim 1 of the ’842 Patent provides for “an OFDM spreader configured *to spread a plurality of data symbols with Fourier coefficients* to generate a discrete Fourier Transform (DFT)-spread data signal.” And claims 2 and 25 of the ’568 Patent recite how “the transform precoding *spreads the block of complex-valued symbols with a plurality of orthogonal spreading codes comprising complex-valued coefficients of a discrete Fourier transform (DFT)* to produce the block of transform-precoded complex-valued symbols.” By contrast, other claims use “spread” or “spreading” as descriptive terms. In particular, claim 1 of the ’227 Patent discloses a “spreading matrix,” “spread symbols,” and a “spread OFDM signal.” In none of these instances does the claim expressly require “spread” to use a “frequency-domain code.” That some of these might fall within the category of frequency-domain codes does not mean the claim must be recharacterized to say so, especially when the claim language itself involves either more or less specificity. Indeed, certain of the claims describe orthogonal codes as “spreading codes.” (*See, e.g.*, ’227 Patent, claim 22, and ’568 Patent, claim 1.) Importing a blanket requirement of frequency-domain codes into all instances of “spread” and “spreading” would improperly narrow the claims beyond what the inventor claimed. For these reasons, the Court declines to adopt Plaintiff’s proposed construction.

The Court has further reviewed the relevant portions of the written descriptions cited by Plaintiff. While the specifications do discuss DFT spreading and CI codes in connection with OFDM systems, this does not establish that every instance of “spread” or “spreading” in the claims

must involve frequency-domain codes. The specifications describe various embodiments and implementations, but the claims define the scope of the invention.

As for Plaintiff's concern between potential confusion between spreading of OFDM signals and spread spectrum communications, the Court finds that the context of the claims and patents provides sufficient clarity. Claims 1 and 2 of the '842 Patent are clearly about "an OFDM transmitter." The '227 Patent is titled "pre-coding in multi-user MIMO." The '568 Patent is titled "single carrier frequency division multiple access baseband signal generation." And the '786 Patent is titled "multicarrier sub-layer for direct sequence channel and multiple-access coding," with claims 1 and 10 setting forth a method and apparatus for wireless communication that employs complex-valued codes. None mentions spread spectrum communication technologies. The claims themselves repeatedly reference OFDM subcarriers, OFDM modulators, and OFDM signals, making clear that the spreading occurs in an OFDM context. To the extent any ambiguity might arise at trial, the parties' expert witnesses can distinguish between OFDM spreading and spread spectrum communications. This distinction between technologies is not a matter requiring claim construction.

The Court therefore finds "spread" and "spreading" **should be given their plain and ordinary meaning.**

#### 4. "at least one of known training symbols and synchronization symbols"

| Claim term | Plaintiff's Construction | Defendant's Construction |
|---|---|---|
| "at least one of known training symbols and synchronization symbols"<br><br>('842 Patent, claim 4) | plain and ordinary meaning<br><br>("at least one of" requires one or the other) | at least one of known training symbols ***and*** at least one of known synchronization symbols. |

Plaintiff represents in its Reply brief that it no longer asserts '842 claim 4 in this case. (Dkt. No. 133, p. 5.) Therefore, the Court does not construe this term.

**5. "a transceiver-control circuitry configured for: provisioning…"**

| Claim term | Plaintiff's Construction | Defendant's Construction |
|---|---|---|
| "transceiver-control circuitry configured for: provisioning a consecutive series of Orthogonal Frequency Division Multiplexing (OFDM) subcarriers for uplink or downlink communications; provisioning a plurality of different selectable subcarrier spacings for the consecutive series of OFDM subcarriers"<br><br>('508 Patent, claims 17, 1) | Does not require construction, plain and ordinary meaning to POSITA. | Plain and ordinary meaning, but the transceiver- control circuitry must be for provisioning a consecutive series of OFDM subcarriers for uplink or downlink communications **before** provisioning a plurality of different selectable subcarrier spacings for the consecutive series of OFDM subcarriers |

The central dispute as to this term is whether the claim language imposes a temporal sequence requiring that the transceiver-control circuitry (1) provision the consecutive series of OFDM subcarriers ***before*** (2) provisioning the plurality of different selectable subcarrier spacings for those subcarriers. In other words, whether step (1) must occur before step (2).

Plaintiff argues that the claim language contains no temporal ordering requirement and that Defendant seeks to improperly import a limitation that does not appear in the claims. Plaintiff emphasizes that claim 17 is an apparatus claim simply requiring that the transceiver-control circuitry be "configured for" the two provisioning functions and does not require the actual performance of these functions in any particular sequence. The claim merely specifies capabilities, not operational ordering. Nothing in the claim language requires that provisioning the subcarriers

be done before provisioning the subcarrier spacings, nor does it require that the circuitry be configured for one before being configured for the other. Plaintiff argues that Defendant's construction would transform a structural claim element describing circuitry capabilities into a method claim with ordered steps.

Plaintiff also addresses the related method claim 1, which does recite provisioning steps. For this claim, Plaintiff invokes the established principle that "[u]nless the steps of a method [claim] actually recite an order, the steps are not ordinarily construed to require one." *Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1342 (Fed. Cir. 2001). Plaintiff points out that the claim contains no temporal connectors such as "after," "then," "subsequently," or "before" that would signal sequential ordering.

Plaintiff further contends the patent contradicts Defendant's rigid ordering argument by citing to the specification which states: "Different blocks of subcarriers can be configured ***prior to assignment or on the fly***, and in a manner that subcarrier parameters (such as number of subcarriers and their spacing) are configured to enable orthogonal spreading codes (or at least spreading codes with low cross correlation)." ('508 Patent at 31:43-48.) This disclosure, according to Plaintiff, demonstrates that the selection of subcarriers and subcarrier parameters are flexible and can occur in any order or simultaneously.

Plaintiff's expert, Dr. Goldburg, provided technical testimony supporting the view that no sequential order is logically or implicitly required. Dr. Goldburg explained that in OFDM systems where the number of subcarriers is independent of subcarrier spacing, the provisioning steps can be performed in any order. Dr. Goldburg testified that even where the number of subcarriers depends on spacing, the steps can still be performed in any order if subcarrier indices are always chosen to be no more than the minimum number available with any spacing. Dr. Goldburg

emphasized that "determining the subcarrier spacing and subcarrier indices to be used by the system is a separate matter from when and how those quantities are communicated to, or acted upon by, other elements of the OFDM system." Dr. Goldburg highlighted that if Defendant's position requires an immutable choice of subcarriers made in advance and independently of spacing choice, such ordering would be infeasible when available subcarriers are a function of subcarrier spacing.

Defendant responds that the claim language itself demands sequential ordering based on principles of claim grammar and logic. Defendant contends that the second provisioning function, "provisioning a plurality of different selectable subcarrier spacings for ***the*** consecutive series of OFDM subcarriers," uses the definite article "***the***" to refer back to "***a*** consecutive series of Orthogonal Frequency Division Multiplexing (OFDM) subcarriers" introduced in the first provisioning function. This grammatical structure, according to Defendant, establishes an antecedent basis that logically requires the initial provisioning of the subcarriers to occur before provisioning selectable subcarrier spacings for them, as the latter provisioning cannot meaningfully proceed without the former's defined reference. Thus, the transceiver-control circuitry must be configured to perform these actions in the order recited.

Defendant supports this reading with Federal Circuit precedent. In *Hytera Commc'ns Co. v. Motorola Sols., Inc.*, 841 F. App'x 210, 218 (Fed. Cir. 2021), the court explained that when determining "if the steps of a method claim that do not otherwise recite an order, must nonetheless be performed in the order in which they are written," courts "look to the claim language to determine if, as a matter of logic or grammar, they must be performed in the order written." (citation omitted). Moreover, in *Medtronic, Inc. v. Teleflex Life Scis. Ltd.*, 2024 WL 1208642at *3 (Fed. Cir. Mar. 21, 2024), the Federal Circuit held that "although not an ironclad rule, when the

current step of a method claim refers to a previous step using the definite article 'the,' the claim language indicates that the previous step occurs sequentially before the current step."

Defendant further contends that this reading comports with the '508 Patent specification, citing portions for the proposition that the patent first establishes the number and identity of the OFDM subcarriers before introducing flexibility in subcarrier spacing to provide a "flexible frame structure." (*See, e.g.*, '508 Patent, Abstract, at 22:20-29.) Samsung provided no expert testimony to support its position or to rebut Dr. Goldburg's technical analysis.

The Court begins its analysis by examining the relevant claim language from the '508 Patent. Claim 17 recites as follows, with the relevant phrase in bold:

> 17. An apparatus for communicating in a mobile radio communications network, comprising:
>
> a transceiver-control circuitry configured for:
>
> > **provisioning a consecutive series of Orthogonal Frequency Division Multiplexing (OFDM) subcarriers for uplink or downlink communications;**
> >
> > **provisioning a plurality of different selectable subcarrier spacings for the consecutive series of OFDM subcarriers;** and
> >
> > performing discrete Fourier transform (DFT) coding on a plurality of data symbols to produce DFT coded symbols; and
>
> an OFDM transceiver communicatively coupled to the transceiver-control circuitry and configured for:
>
> > performing an inverse-DFT on the coded symbols to produce a single-carrier frequency division multiple access signal that comprises a sum of the consecutive series of OFDM subcarriers; and
> >
> > transmitting the single-carrier frequency division multiple access signal in the mobile radio communications network;
>
> wherein provisioning the plurality of different selectable subcarrier spacings comprises providing the single-carrier frequency division multiple access signal

> with a particular one of a set of different symbol periods by selecting one of the plurality of different selectable subcarrier spacings.

The Court notes that the disputed term as identified by the parties appears only in claim 17, and the Court's construction is therefore limited to that claim. The Court also notes that claim 1 is omitted from this disputed term in the parties' Joint Claim Construction Chart Pursuant to P.R. 4-5(d). (Dkt. No. 132.)

Claim 17 is an apparatus claim, which is a threshold consideration that distinguishes the Federal Circuit cases Defendant relies upon that are about method claims with recited steps. *Medtronic* specifically addressed "when the current ***step*** of a method claim refers to a previous ***step*** using the definite article 'the.' " 2024 WL 1208642 at *3 (emphasis added). Here, by contrast, claim 17 is an apparatus claim that does not recite steps to be performed. Rather, it describes a transceiver-control circuitry that is "configured for" specified capabilities. An apparatus claim using "configured for" language describes structural features and functional capabilities, not an ordered sequence of operations. Defendant has submitted no authority establishing that apparatus claims require a specific order of operation based solely on antecedent basis.

This distinction is not merely semantic. Apparatus claims define the invention in terms of what a device is and what it can do, not in terms of what it must do or in which order it must do it. The claim requires that the circuitry be capable of provisioning both subcarriers and subcarrier spacings. Nothing in the phrase "configured for" imposes temporal constraints on when those capabilities must be exercised or in what sequence they must operate.

Absent clear guidance from the claim language that one configuration must occur before or after another configuration, or referring back to results of a previous configuration, there is no specific order of operations laid out in this claim. Even if the Court were to apply Defendant's

antecedent basis analysis, the use of the definite article "the" in the second provisioning function merely establishes that the subcarrier spacings are for the same subcarriers identified in the first provisioning function. This creates referential connection, not temporal sequence. The spacings must be associated with the identified subcarriers, but the claim does not specify that one configuration must occur before the other.

The written description supports this interpretation. Defendant's citations to the specification do not set forth an ordering of steps. Defendant's citations are general discussions of the subcarrier being "assigned" or "allocated" and how, sometimes, the code length is the number of subcarriers (and sometimes it is more or less). None of these citations clearly say that the invention must ***first*** establish the number and identity of the OFDM subcarriers before obtaining subcarrier parameters (*e.g.*, subcarrier spacing). Notably, Defendant does not respond to the disclosure that "different blocks of subcarriers can be configured ***prior to assignment or on the fly***," ('508 Patent at 31:43-48), which contradicts the notion that subcarriers must be rigidly provisioned before subcarrier spacing parameters are set.

Indeed, the specification goes on to explain that "in some aspects, a WWAN device has subcarrier parameter information available from the scheduling 710. In other aspects, the WWAN device receives the subcarrier parameter information by some other means," such as those transmitted in a control channel, or the WWAN device determines subcarrier parameter information itself from uplink UE transmissions. ('508 Patent at 31:51-60.) These disclosures suggest that the selection of subcarriers and subcarrier parameters, like subcarrier spacing, are flexible such that they can be provided or determined by the device itself, and in any order.

Defendant's specification citations at column 22, lines 20-29, and elsewhere describing that "based on a number of assigned OFDM subcarriers" certain parameters can be selected, do

not compel Defendant's construction. These passages describe one way the system can operate but do not establish that this is the only permissible operational sequence. None of the citations clearly say that the invention must first establish the number and identity of the OFDM subcarriers before obtaining subcarrier parameters. Hence, it would be improper to limit the scope of the claim to exemplary embodiments, particularly where other disclosures are in conflict.

The submitted expert testimony aligns with this interpretation. Dr. Goldburg's detailed technical analysis states that in real OFDM systems, the relationship between subcarrier selection and subcarrier spacing configuration depends on system architecture and operational requirements. In some systems, the choices are independent and can be made in any order or simultaneously. In other systems where available subcarriers are a function of subcarrier spacing, the spacing determination must actually precede or at minimum inform subcarrier selection. In other words, the ordering is completely flexible, which is the opposite of Defendant's proposed ordering. This technical reality undermines Defendant's assertion that claim grammar alone compels a rigid temporal sequence.

Absent a clear intent that the inventor intended to limit the claim to require temporal sequencing, it would be incorrect to import limitations into the claims. The claim language uses no temporal connectors. The specification describes flexible configuration approaches. The expert testimony indicates that rigid ordering is neither required nor always feasible. Under such circumstances, Defendant's proposed construction would impermissibly narrow the scope of the claimed invention.

The Court finds that claim 17's apparatus language requiring circuitry "configured for" the two provisioning functions describes structural capabilities without imposing temporal ordering requirements. The Court therefore construes the term "transceiver-control circuitry configured for:

provisioning a consecutive series of Orthogonal Frequency Division Multiplexing (OFDM) subcarriers for uplink or downlink communications; provisioning a plurality of different selectable subcarrier spacings for the consecutive series of OFDM subcarriers” **to have no order of operations and should be given its plain and ordinary meaning.**

### 6. “provisioning”

| Claim term | Plaintiff’s Construction | Defendant’s Construction |
|---|---|---|
| “provisioning”<br><br>(’508 Patent, claims 1, 17)<br>(’792 Patent, claims 1, 8) | Does not require construction, plain and ordinary meaning to POSITA.<br><br>If construed: “preparing” | Plain and ordinary meaning with the understanding that provisioning is used consistently throughout the identified claims. |

The parties dispute whether “provisioning” requires construction and, if so, whether it should mean “preparing” or “providing.”

Plaintiff urges for plain and ordinary meaning as “provisioning” is a regular English word requiring no further explanation. Plaintiff’s expert, Dr. Goldburg, confirms that the term is used consistently with its plain and ordinary meaning throughout the claims and presents no ambiguity requiring a court-provided definition.

However, if construction is necessary, Plaintiff contends it should mean “preparing” rather than “providing.” Plaintiff offers two rationales for its proposition. First, “providing” connotes a function, such as communicating parameters to other entities, and is inappropriate for apparatus claims designed to describe structures rather than functions. Second, for method claims, Plaintiff argues that subcarrier spacings and selections are prepared or chosen at one point in time but need not be available to system elements performing other method aspects until later, when those

elements act on the prepared choices. Thus, "preparing" better captures the temporal distinction between when parameters are established and when they are used.

Defendant agrees that the word "provisioning" should get its plain and ordinary meaning but emphasizes it must be interpreted consistently within the '508 Patent claims. Defendant distinguishes the '508 Patent from the '792 Patent, asserting that "provisioning" in the '792 Patent presents a different issue because it does not require provisioning different things, so no construction is needed there.

In addition, Defendant opposing defining "provisioning" as "preparing." Defendant notes the '508 Patent does not use "provisioning" in connection with subcarriers or subcarrier spacings except in the Abstract. Instead, the patent refers to the "assigned" or "allocated" subcarriers. Thus, Defendant argues that this demonstrates that provisioning is an act of assignment or allocation. In other words, "providing." Defendant contends that Plaintiff's proposed "preparing" construction contradicts the specification's actual usage and lacks intrinsic record support.

At the claim construction hearing, Defendant asserted that construing "provisioning" as "preparing" would improperly exclude the "allocating" and "assigning" of subcarriers described in the specification. Plaintiff responded that the acts of "allocating" and "assigning" are included within its meaning of "preparing."

The Court begins its analysis by examining the claim language to understand how "provisioning" is used in the context of the claims. Absent a disclaimer or statement by the patentee that "provisioning" has a different meaning in certain patents than others, this term should be construed consistently across both the '508 Patent and the '792 Patent.

The '508 Patent claims 1 and 17 use "provisioning" in specific contexts that provide insight into its meaning. Claim 1 of the '508 Patent is a method claim that recites, in relevant part:

> A method of communicating in a mobile radio communications network, comprising:
>
> **provisioning** a consecutive series of Orthogonal Frequency Division Multiplexing (OFDM) subcarriers **for** uplink or downlink communications;
>
> **provisioning** a plurality of different selectable subcarrier spacings **for** the consecutive series of OFDM subcarriers;
>
> . . .

Claim 17 of the ’508 Patent is an apparatus claim that similarly recites, in relevant part:

> An OFDM transceiver comprising:
>
> a transceiver-control circuitry configured for:
>
> **provisioning** a consecutive series of Orthogonal Frequency Division Multiplexing (OFDM) subcarriers **for** uplink or downlink communications
>
> **provisioning** a plurality of different selectable subcarrier spacings **for** the consecutive series of OFDM subcarriers
>
> . . .

In both claims, “provisioning” is used twice: first in connection with a consecutive series of OFDM subcarriers ***for*** uplink or downlink communications, and second in connection with a plurality of different selectable subcarrier spacings ***for*** the consecutive series of OFDM subcarriers. The repeated use of the preposition “for” suggests a preparatory relationship: The subcarriers are provisioned for communications, and the subcarrier spacings are provisioned for the subcarriers.

The ’792 Patent claims 1 and 8 use “provisioning” in a similar context. Claim 1 of the ’792 Patent recites:

> A method of providing a flexible channel bandwidth for mobile radio communications, comprising:
>
> **provisioning** a set of Orthogonal Frequency Division Multiplexing (OFDM) subcarriers **for** mobile radio communications;

> encoding data symbols with polyphase codes derived from a discrete Fourier transform to produce encoded data symbols; and
>
> modulating the encoded data symbols onto the OFDM subcarriers to produce a superposition signal that resembles a single-carrier signal and has one of a plurality of different symbol durations;
>
> wherein provisioning comprises selecting one of a plurality of different selectable subcarrier spacings, to provide for the one of the plurality of different symbol durations.

Here again, "provisioning" is used in connection with OFDM subcarriers ***for*** mobile radio communications, and the claim specifies that this provisioning "comprises selecting" subcarrier spacings "to provide for" symbol durations. This language reinforces the preparatory nature of provisioning. It involves selecting parameters that will later be used to provide for certain characteristics.

The fact that the '792 Patent claim uses "provisioning" for one element and the '508 claims use "provisioning" for two elements is irrelevant. The term is used consistently in both patents. As Dr. Goldburg explained, "provisioning" is used consistently with its plain and ordinary meaning throughout the claims. (Dkt. No. 125-9, ¶79.) The Court agrees that the terms are used consistently, so the task now is to identify its meaning.

The specification provides context for understanding how "provisioning" is used in the claims and what it means to a person of ordinary skill in the art. The '508 Patent uses "provision" in ways that distinguish it from both "perform" and "provide."

First, the specification of the '508 Patent at 17:29-31 states: "A first network topology can be ***provisioned to perform*** a first one of the processes and a second network topology can be ***provisioned to perform*** a second one of the processes." This passage is instructive because it shows that "provision" has a different meaning from "perform." The topology is provisioned (i.e., prepared or set up) ***to*** perform a process. The provisioning is the preparatory step that enables the

subsequent performance. If "provisioning" meant the same thing as "performing," this sentence would be redundant or nonsensical. Instead, the specification clearly distinguishes between provisioning something and that thing performing its function.

Second, at column 21 lines 28-31, the '508 Patent explains: "In some aspects, the spreading-code generator 432 advantageously ***provisions*** an NxN spreading matrix (or corresponding set of complex codes) ***to provide for*** N orthogonal spreading codes." This passage is similarly instructive because it shows that "provision" has a different meaning from "provide." Something is provisioned in order to provide for something else. The provisioning of the matrix is the preparatory step that enables the provision of orthogonal spreading codes. Again, if "provisioning" meant the same thing as "providing," the words would be redundant. The specification's choice to use both terms in the same sentence indicates they have different meanings.

Third, the specification's treatment of the OFDM subcarriers and selectable subcarrier spacings that are the subject of the claims supports the inventor's intent for it to be in preparation of something. When discussing these elements, the specification describes them as "assigned" or "allocated" for later use rather than as "provided" at the moment of use. (*See, e.g.*, '508 Patent at 22:20-33, 27:58-28:5.) The specification repeatedly refers to "assigned OFDM subcarriers," which indicates a preparatory designation or allocation, not a contemporaneous provision. Other passages similarly discuss "assigned subcarriers" (*id.* at 4:17-18, 21:58-61) and "allocated subcarriers" (*id.* at 23:29-37). These terms of assignment and allocation are consistent with the concept of preparing, designating or setting aside resources for future use.

The '792 Patent similarly uses "provisioning" in the context of setting something up to perform a function. At column 60 lines 24-26, the specification states: "In one aspect, selecting

2702 comprises provisioning a plurality of the transceivers to cooperatively transmit signals in the second link." This usage shows provisioning as preparation or configuration for future transmission, not the transmission itself. The transceivers are provisioned (*i.e.*, prepared or configured) so that they can cooperatively transmit signals.

Defendant argues that the specification's use of "assigned" and "allocated" shows that provisioning means "providing" (*i.e.*, an act of assignment or allocation is an act of providing). But this argument fails to account for the temporal dimension, which is at the heart of the parties' dispute. Like preparing, assignment and allocation are preparatory acts that designate resources for future use. They are not the same as delivering or providing those resources at the moment of use. "Preparing" better captures this preparatory, forward-looking aspect. The Court therefore accepts Plaintiff's agreement that preparing encompasses allocating and assigning.

The Court finds that, although "provisioning" is not a special term of art, the parties have identified a temporal distinction as used in this context of these claims that should be clarified for the jury. The Court therefore construes "provisioning" **to mean "preparing."**

### 7. "a mapper configured to map the DFT-spread data signal to a plurality of OFDM subcarriers"

| Claim term | Plaintiff's Construction | Defendant's Construction |
|---|---|---|
| "a mapper configured to map the DFT-spread data signal to a plurality of OFDM subcarriers"<br><br>('842 Patent, claim 1) | Not a means plus function term under § 112<br><br>Does not require construction, plain and ordinary meaning to POSITA.<br><br>Not indefinite | This term is not written to receive the benefit of 35 U.S.C. § 112(f).<br><br>The claimed mapper includes any circuit or software for performing the claimed function that is not the claimed "OFDM spreader" or "OFDM modulator." |

| | | |
|---|---|---|
| | | This term is indefinite because it claims the invention functionally at a point of novelty. |

The parties dispute whether this term is (1) indefinite, and if not, (2) whether the "mapper" must be a distinct circuit or software component from the claimed "OFDM spreader" and "OFDM modulator." The Court addresses each issue separately.

Issue 1: Indefiniteness

Plaintiff argues that a "mapper" is sufficiently disclosed in the patent and was well known in the art, so the term is definite. Plaintiff contends that claim 1 of the '842 Patent and its specification make clear to a person of ordinary skill in the art that a "mapper" is a component that maps DFT-spread reference symbols to a plurality of OFDM subcarriers. In particular, Plaintiff points to column 68, lines 34-40, of the specification, which provides: "A symbol-to-subcarrier mapper maps DFT-spread symbols of the DFT-spread reference signal to a plurality of OFDM subcarriers 2902. For example, mapping 2902 can be performed according to an OFDMA scheme, some other multiple-access scheme, and/or any other multiplexing scheme, such as disclosed herein." Plaintiff further submits that mappers were known in the industry, noting that over 400 Samsung patents have "mapper" in their claims and over 7,000 Samsung patents have "mapping" in their claims. According to Plaintiff, this widespread industry usage demonstrates that no construction is required.

Defendant takes the position that although this is not a means-plus-function term, it is nonetheless indefinite for functional claiming because a "mapper" as recited can constitute any circuit or software capable of performing the claimed function of "map the DFT-spread data signal to a plurality of OFDM subcarriers." Therefore, Defendant argues that this term is

impermissibly broad and indefinite. Defendant relies on Dr. Mahon's expert opinion that "the '842 Patent explains that the functional blocks are to be understood so broadly that they include both known ways to perform the claimed functionality and unknown ways that had not even been devised yet." (Dkt. No. 125-11, ¶47.) Defendant analogizes this situation to *Markem-Imaje Corp. v. Zipher Ltd.*, No. 07-cv-00006-PB, 2012 U.S. Dist. LEXIS 112502 (D. N.H. Aug. 9, 2012), where "controller" was found to be indefinite, and urges the Court to find indefiniteness on similar grounds.

The Court begins its analysis with an examination of the claim language. Claim 1 of the '842 Patent recites as follows, with the disputed element in bold:

> 1. An OFDM transmitter, comprising:
>
> an OFDM spreader configured to spread a plurality of data symbols with Fourier coefficients to generate a discrete Fourier Transform (DFT)-spread data signal;
>
> **a mapper configured to map the DFT-spread data signal to a plurality of OFDM subcarriers**; and
>
> an OFDM modulator configured to modulate the DFT-spread data signal onto the plurality of OFDM subcarriers to produce an OFDM transmission signal comprising a superposition of the OFDM subcarriers, wherein the OFDM spreader is configured to provide the superposition with a reduced peak-to-average power ratio.

As a preliminary matter, the Court notes that both sides submit that this is not a means-plus-function term and 35 U.S.C. § 112(f) does not apply. The Court agrees. The claim language does not use the phrase "means for" or similar means-plus-function language. When claim language lacks the word "means," there is a rebuttable presumption that § 112(f) does not apply. *See Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1348 (Fed. Cir. 2015) (*en banc*). Defendant has not overcome this presumption.

Defendant nonetheless argues that "mapper" is purely functional claiming and is indefinite because it encompasses any circuit or software that can perform the claimed function. However, Defendant bears the burden to prove indefiniteness by clear and convincing evidence. Defendant has not met its burden for several reasons.

First, Defendant's argument is undermined by its selective application. Defendant does not make this same indefiniteness argument about the other two elements in claim 1, the OFDM "spreader" or "modulator," despite their similar claim language structure. All three elements are written in the same functional format using "configured to" language. Like the mapper, the OFDM spreader is "configured to" perform a function—that of "spread[ing] a plurality of data symbols with Fourier coefficients to generate a discrete Fourier Transform (DFT)-spread data signal." Similarly, the OFDM modulator is "configured to" perform the function of "modulat[ing] the DFT-spread data signal onto the plurality of OFDM subcarriers to produce an OFDM transmission signal comprising a superposition of the OFDM subcarriers." Like the mapper, neither the spreader nor the modulator includes structural recitation beyond the component name itself. If Defendant's theory were correct, all three elements would be indefinite. Yet Defendant challenges only the "mapper."

Second, the relevant inquiry is whether the term "mapper" itself provides sufficiently definite structure as understood by persons of ordinary skill in the art. Terms that have recognized meaning in the art can provide adequate structural limitations even when coupled with functional language. The evidence demonstrates that "mapper" is a commonly known component of OFDM transmitters. Plaintiff's expert, Dr. Goldburg, opined that a POSITA would have no problem understanding what the claimed "mapper" is with reasonable certainty in the context of the '842 Patent claims and the specification. (Dkt. No. 125-9, ¶¶23-26.) Dr. Goldburg explains that those

of skill in the art understand a mapper as "a component that maps DFT-spread reference symbols to a plurality of OFDM subcarriers." (*Id.*, ¶27.) Critically, Defendant's expert, Dr. Mahon, does not dispute that mappers are well known in the art in his opinion on this term. Defendant has provided no expert testimony contradicting Dr. Goldburg's testimony that one of ordinary skill understands the structural nature of a mapper in an OFDM context.

Third, the specification provides additional context confirming that "mapper" has an understood meaning in the art. The '842 Patent discloses that mapping is the selecting or assigning of OFDM subcarriers. Specifically, the specification explains that "selection" (*i.e.*, scheduling) of OFDM subcarriers (*e.g.*, mapping 2902) can be based on some quality metric associated with the channel quality of each subcarrier. ('842 Patent at 70:34-37.) The specification further states that "the assignment of a device's subcarrier can be performed by a mapping module 3022." (*Id.*at 71:25-26.) These disclosures explain that mapping involves the fundamental operation of assigning DFT-spread data to specific subcarriers within the OFDM framework.

The specification also discloses how mapping may be performed by processes known in the art. In particular, the patent teaches that "[m]apping 2902 can be performed according to an OFDMA scheme, some other multiple-access scheme, and/or any other multiplexing scheme, such as disclosed herein." (*Id.*at 68:34-40.) Additionally, the specification provides a concrete example: "A symbol-to-subcarrier mapping source code segment 3103 maps each of the N DFT outputs of x to one of M (M>N) orthogonal subcarriers." (*Id.*at 74:4-6.) This passage describes the practical implementation of the mapping function according to known schemas and with specificity regarding the inputs, outputs, and the relationship between them.

The specification further defines the result of mapping operations. The patent explains that "the result of the subcarrier mapping is a set of complex subcarrier amplitudes, where N of the

amplitudes are non-zero." (*Id.* at 74:16-18.) This disclosure provides one of skill with a clear understanding of what the mapper produces, thereby further defining the bounds of the claimed invention.

The specification thus sufficiently discloses what a mapper is, how it functions, and what it produces. The mapper performs a specific, well-defined task in the OFDM transmitter: mapping DFT-spread data signals to OFDM subcarriers through selection or assignment according to various multiplexing schemes. These descriptions are consistent with the understanding that "mapper" identifies a known structural component.

This is a fundamentally different disclosure from the *Markem-Imaje* case Defendant relies upon, where the term was found indefinite based on the exceptionally broad and unbounded nature of the claimed "controller." The patent in *Markem-Imaje* required a generic "controller" that performs a variety of functions, "including energizing motors to transport tape, calculating a correction amount of tape, and operating the motors to maintain tape tension at an acceptable level," functions that the patent owner conceded the controller is not inherently capable of performing without special programming that is not disclosed in the patent. 2012 U.S. Dist. LEXIS 112502 at *24-25. Even the patent owner's counsel admitted at the *Markman* hearing that "controller" was a "deliberately chosen broad term that was intended to cover every controller capable of performing the recited functions, no matter the algorithm . . . ." (*Id.* at *25 (internal quotation omitted)). These admissions revealed the impermissible intent to capture any and all possible implementations of a controller. Here, by contrast, "mapper" is a recognized term of art with understood structural meaning in OFDM systems, and the specification confirms rather than contradicts this understanding.

The Court finds that a "mapper" is a specific component, like a spreader or a modulator, that performs a specific task in an OFDM transmitter. The term "mapper" is accordingly not indefinite.

Issue 2: Whether "mapper" is a distinct circuit of software component

Having found "mapper" not indefinite, the Court turns to the second issue: Whether the "mapper" must be a distinct circuit or software component from the claimed "OFDM spreader" and "OFDM modulator."

As to this point, Plaintiff contends that Defendant seeks to read an additional requirement into the claims, one that the '842 Patent nowhere recites and for which no intrinsic evidence exists. Plaintiff argues that nothing in the patent requires the mapper to avoid sharing any circuit or software with the OFDM spreader or modulator. Plaintiff asserts that even Defendant's expert, Dr. Mahon, fails to identify intrinsic evidence supporting this limitation and that his declaration confirms the components are interconnected: the outputs of one component go into the inputs of others, and that Figure 31 shows the mapper (3103 symbol to subcarrier mapping) is part of the same memory as the OFDM spreader (3102) and modulator (software components 3104-3105). (Dkt. No. 125-11, ¶¶44-46.) Plaintiff further emphasizes that as a matter of practical engineering, modern wireless communications systems contain many functional blocks realized with physical circuits that may be reused for multiple purposes rather than having a dedicated circuit per process.

Defendant responds that the claim language as written requires the mapper to be distinct from the "OFDM spreader" and "OFDM modulator." Defendant argues that claim 1 requires for an OFDM spreader to generate a DFT-spread data signal, after which a mapper maps that generated signal to a plurality of subcarriers. Logic thus dictates, according to Defendant, that the DFT spreader, the mapper, and the OFDM modulator are distinct functional blocks, with the result of

one block feeding into the next. Defendant contends the specification supports this reading by depicting distinct spreading, mapping, and modulating blocks in sequence. Defendant clarifies that its proposed construction does not preclude these components from residing in the same apparatus, but only that they must constitute distinct portions of that apparatus.

Upon examining the claim language, the Court finds that the OFDM spreader, mapper, and OFDM modulator are distinct elements in the sense that claim 1 recites three separate limitations. However, Defendant's argument that they are "distinct functional blocks and that the result of one block is used in the next block" is imprecise. Rather, the claim language controls this analysis.

Claim 1 recites "an OFDM spreader configured . . . to generate ***a*** discrete Fourier Transform (DFT)-spread data signal," followed by "a mapper configured to map ***the*** DFT-spread data signal to ***a*** plurality of OFDM subcarriers," and then "an OFDM modulator configured to modulate ***the*** DFT-spread data signal onto ***the*** plurality of OFDM subcarriers." This claim structure demonstrates a sequential relationship: the spreader generates the DFT-spread data signal, the mapper then maps that signal to subcarriers, and the modulator then modulates that signal onto those subcarriers. Whether these processes are performed by components that share a circuit or software, reside within the same apparatus, or occupy distinct physical portions of an apparatus is a question of application. Whether each claim element is met is reserved for an infringement analysis and falls outside the province of claim construction. As claim 1 clearly sets forth the interaction and relationship between its recited elements, the plain and ordinary meaning controls.

The Court therefore finds "a mapper configured to map the DFT-spread data signal to a plurality of OFDM subcarriers" **is not indefinite and should be given its plain and ordinary meaning.**

### 8. Preambles of Claims 1 and 10 of the ’786 Patent

| Claim term | Plaintiff’s Construction | Defendant’s Construction |
|---|---|---|
| Preambles of claims 1 and 10 of the ’786 Patent | The preamble is not a limitation.<br><br>Does not require construction, plain and ordinary meaning to POSITA. | The preamble is a limitation.<br><br>The apparatus employs a first and second set of complex-valued codes as recited in this claim. |

The central dispute concerns whether the preambles of claims 1 and 10 of the ’786 Patent require the claimed method and apparatus to employ both a first and second set of complex-valued codes, or whether these code sets merely describe the wireless communication network environment in which the method and apparatus operate. Put differently, the parties disagree on whether the preamble language modifies the claimed method and apparatus themselves or describes the network context.

Plaintiff maintains the preambles are not limiting because they recite neither essential structure, steps, or information necessary to give life, meaning, and vitality to the claims. According to Plaintiff, the claim body describes a structurally complete invention that remains intact even if the preamble phrase were deleted. Plaintiff relies on Dr. Goldburg’s expert opinion that while the claims reference two code sets, only the first set is employed by the transmitting device; the second set is employed by a separate receiver apparatus within the network. From this, Plaintiff reasons that the wireless communication network itself employs both code sets (one for transmission, one for reception) rather than the particular claimed method or apparatus operating within that network. Plaintiff argues the preamble language clearly describes the network

environment and warns that attributing the recovery function to the claimed method or apparatus would improperly transform the preamble into an additional method step.

Defendant counters that the preambles are limiting because they provide antecedent basis for terms appearing in the body of the claim and, if omitted, the claim would fail to recite a complete invention. Defendant identifies two instances where the claim body depends on preamble antecedent basis. First, the preamble introduces the concept of "data symbols to be transmitted" and then recites "encoding the data symbols . . . to produce encoded data symbols." Second, the preamble introduces "a first set of complex-valued codes" and "a second set of complex-valued codes," and then the body of the claim requires "the first set of complex-valued codes are complex conjugates of the second set of complex-valued codes." Without the preamble, Defendant argues, the claim's final limitation would lose contextual meaning. It would state only that the first code set comprises complex conjugates of the second code set without any foundation for the second set. Defendant also advances a grammatical argument, contending that the phrase employing both code sets functions as a restrictive clause modifying the method and apparatus rather than merely describing the network. This interpretation finds support, Defendant maintains, in the claim body's express recitation of encoding with the first code set. Finally, Defendant points to specification disclosure of transceivers, devices capable of both transmission and reception, as supporting the patentee's intended construction that the claimed apparatus employs both code sets.

The Court begins its analysis by examining the claim language of the '786 Patent. Claims 1 and 10 recite as follows, with the relevant portions in bold:

| | |
|---|---|
| 1. A method of communication in a wireless communication network that **employs a first set of complex-valued codes to encode data symbols to be transmitted**, and **employs a second set of complex-valued codes to recover** | 10. An apparatus for communication in a wireless communication network that **employs a first set of complex-valued codes to encode data symbols to be transmitted,** and **employs a second set of complex-valued codes to** |

| | |
|---|---|
| **transmitted data symbols from a received signal**, the method comprising:<br><br>selecting a plurality of subcarriers to be transmitted;<br><br>encoding the data symbols with **the first set of complex-valued codes** to produce encoded data symbols;<br><br>applying the encoded data symbols to the plurality of subcarriers to produce a spread-Orthogonal Frequency Division Multiplexing (OFDM) signal; and<br><br>transmitting the spread-OFDM signal;<br><br>wherein **the first set of complex-valued codes** are complex conjugates of **the second set of complex-valued codes.** | **recover transmitted data symbols from a received signal**, the apparatus comprising:<br><br>at least one processor; and<br><br>a non-transitory computer-readable memory communicatively coupled to the at least one processor, the non-transitory computer-readable memory including a set of instructions stored thereon and executable by the at least one processor for:<br><br>selecting a plurality of subcarriers to be transmitted;<br><br>encoding the data symbols with **the first set of complex-valued codes** to produce encoded data symbols;<br><br>applying the encoded data symbols to the plurality of subcarriers to produce a spread-Orthogonal Frequency Division Multiplexing (OFDM) signal; and<br><br>transmitting the spread-OFDM signal;<br><br>wherein **the first set of complex-valued codes** are complex conjugates of **the second set of complex-valued codes**. |

The Court first considers the threshold question of whether the preambles are limiting at all. The Federal Circuit has "repeatedly held a preamble limiting when it serves as antecedent basis for a term appearing in the body of a claim." *In re Fought*, 941 F.3d 1175, 1178 (Fed. Cir. 2019). Here, the body of each claim relies on antecedent basis provided by the preamble for multiple elements.

First, the preamble introduces the concept of "data symbols to be transmitted." The body of the claim then recites "encoding the data symbols . . . to produce encoded data symbols." By using the definite article "the" before "data symbols" in the body of the claim, the claim establishes

a clear reference back to the antecedent "data symbols to be transmitted" recited in the preamble. This creates necessary antecedent basis for the data symbols that are the subject of the encoding step.

Second, the preamble introduces "a first set of complex-valued codes" and "a second set of complex-valued codes." The body of the claim sets forth "wherein the first set of complex-valued codes are complex conjugates of the second set of complex-valued codes." Again, the definite article "the" before "first set" and "second set" in the body limitation creates a direct reference to the first and second sets introduced in the preamble. Without the preamble, this limitation would be indefinite, as it would refer to "the first set" and "the second set" in a vacuum. The preamble thus provides necessary antecedent basis for understanding the relationship between the first and second sets of codes.

A preamble may also be limiting if it "recites essential structure or steps, or if it is 'necessary to give life, meaning, and vitality' to the claim." *Arctic Cat Inc. v. GEP Power Prod., Inc.*, 919 F.3d 1320, 1327-1328 (Fed. Cir. 2019). Here, the preamble is necessary to provide context for the claim's final limitation: "wherein the first set of complex-valued codes are complex conjugates of the second set of complex-valued codes." Otherwise, the second set of complex-valued codes would be untethered to the rest of the claim. Within the context of the preambles, however, the first and second set of complex-valued codes are given the purpose of being employed to encode and decode the transmitted or received data symbols, respectively. For these reasons, the preambles of claims 1 and 10 are indeed limiting.

Having determined that the preambles are limiting, the Court next turns to the question of whether the preamble language "that employs" modifies the claimed "method" and "apparatus" of

communication or merely describes the "wireless communication network" environment. The grammatical structure of the claims provides the answer.

The preamble of claim 1, which is representative, recites: "A method of communication in a wireless communication network **that employs a first set of complex-valued codes to encode data symbols to be transmitted, and employs a second set of complex-valued codes to recover transmitted data symbols from a received signal**." The phrase "that employs . . . to encode . . . and employs . . . to recover" functions as a restrictive clause that "limits the essential meaning of the sentence element it modifies or identifies." *William Strunk, Jr. & E.B. White, The Elements of Style* 84 (4th ed. 2000). The question, then, is what noun the restrictive clause modifies.

The grammatical structure indicates that "that employs" modifies the immediately preceding noun phrase, which is the entire phrase "A method of communication in a wireless communication network." The syntax does not support reading it as modifying only "wireless communication network" while excluding the method or apparatus. As a matter of grammar, a restrictive clause introduced by "that" modifies the complete noun phrase that immediately precedes it, not merely the final noun within that phrase. Here, the complete noun phrase is "A method of communication in a wireless communication network," which serves as the subject that "employs" both sets of codes.

This understanding is confirmed by the claim body's express recitation of "encoding" using the "first set of complex-valued codes." Undoubtedly, it is the claimed method that performs this encoding and makes use of the first set of complex-valued codes, not the network. The same holds true even more clearly for claim 10, which recites an apparatus with a processor for "encoding the data symbols with the first set of complex-valued codes."

The ’786 Patent specification supports this understanding of the claim language. It describes transceivers and their dual functionality being capable of both transmitting and receiving. (*See, e.g.*, ’786 Patent at 12:49 and 12:57.) Dr. Goldburg’s testimony also aligns in its explanation that the first set of complex-valued codes are used to encode data symbols for transmission and the second set of complex-valued codes are used to recover or decode the encoded data symbols that were received. This functionality can be achieved without requiring that the transmitting and receiving functions be separately claimed.

The Court therefore finds **the preambles of claims 1 and 10 of the ’786 Patent are limiting.**

**9. “further comprising adding a cyclic prefix to the time-domain waveform”**

| Claim term | Plaintiff’s Construction | Defendant’s Construction |
|---|---|---|
| “further comprising adding a cyclic prefix to the time-domain waveform”<br><br>(’285 Patent, claims 7, 17) | Does not require construction, plain and ordinary meaning to POSITA. | A cyclic prefix is added to the time-domain waveform that comprises a superposition of the plurality of modulated subcarriers. |

The issue as to this term is whether construction is required to clarify its antecedent basis for the jury.

Independent claims 1 and 11 of the ’285 Patent recite “producing a time-domain waveform that comprises a superposition of the plurality of modulated subcarriers.” Dependent claims 7 and 17, which depend respectively from these independent claims, recite “further comprising adding a cyclic prefix to the time-domain waveform.” The dispute centers on whether the phrase “the time-domain waveform” in the dependent claims requires construction to clarify that it refers back to

the specific "time-domain waveform that comprises a superposition of the plurality of modulated subcarriers" recited in the parent independent claims.

Plaintiff argues the term should be given its plain and ordinary meaning because Defendant has identified no genuine ambiguity requiring construction.

Defendant responds that construction is necessary not because the term is ambiguous, but because Plaintiff refuses to acknowledge that antecedent basis principles apply. Defendant contends that because Plaintiff remains "noncommittal on the meaning of this phrase," the Court should construe the term as a matter of law by explicitly applying antecedent basis rules. According to Defendant, the jury should not be left to invoke this canon of claim construction on their own.

In its Reply brief, Plaintiff concedes the application of antecedent basis principles by acknowledging that "time-domain waveform that comprises a superposition of the plurality of modulated subcarriers" from claim 1 is what the cyclic prefix is added to. (Dkt. No. 133 at 9.)

No genuine dispute therefore exists. Both parties acknowledge that antecedent basis applies, and the Court agrees. Clearly, "the time-domain waveform" in the dependent claims refers to the same "a time-domain waveform" produced in the independent claims that "comprises a superposition of the plurality of modulated subcarriers" and is "to be transmitted in the wireless network by the user device." The use of the definite article "the" before "time-domain waveform" in the dependent claim creates an antecedent basis relationship with "a time-domain waveform" introduced in the independent claims. The claim language itself compels this straightforward interpretation.

The parties have identified no other ambiguity in the claims. Dr. Goldburg's testimony confirms that the use of cyclic prefixes in OFDM systems is "pervasive, fundamental and well-known to POSITAs." (Dkt. No. 125-9, ¶90.) Given this shared understanding and the clear

antecedent basis relationship established by the claim language, no construction is necessary to aid the jury.

The Court finds "further comprising adding a cyclic prefix to the time-domain waveform" **should be given its plain and ordinary meaning.**

**10. "a first of the set of data symbols"/ "a second of the set of data symbols"**

| Claim term | Plaintiff's Construction | Defendant's Construction |
|---|---|---|
| "a first of the set of data symbols"<br><br>"a second of the set of data symbols"<br><br>('285 Patent, claims 1, 11) | Plain and ordinary meaning.<br><br>Requires no further construction | A first data symbol of the set of data symbols<br><br>[and]<br><br>A second data symbol of the set of data symbols |

The issue as to these terms is whether it is phrased ambiguously as to what "a first of" and "a second of" refers to within the set of data symbols such that the Court must clarify these claim phrases for the jury.

Plaintiff argues that no construction is necessary because Defendant has identified no genuine ambiguity. Plaintiff contends that Defendant's proposed construction changes the meaning of the claims by adding requirements about which specific data symbols must be encoded and in what order. According to Plaintiff, the current claim language referring to "a first of the set" and "a second of the set" simply requires encoding one data symbol and then another, without imposing additional constraints about their identity or sequence within the set.

Defendant responds that its construction merely clarifies the implicit noun missing from the phrases "a first of" and "a second of." Defendant asserts these phrases obviously refer to a first data symbol and a second data symbol from the set of data symbols. Defendant points to the '285

Patent specification, particularly FIG. 29B, which depicts a set of data symbols along with the polyphase codes by which they are multiplied, as support for this interpretation. Defendant notes that Plaintiff does not actually disagree with the substance of the proposed construction but argues only that it is unnecessary.

The Court begins its analysis with the claim language itself, using claim 1 of the '285 Patent as representative, with relevant portions in bold:

> 1. A method for communication by a user device in a wireless network, comprising:
>
> **encoding a set of data symbols** with a set of complex-valued codes, to produce a set of subcarrier values;
>
> modulating the set of subcarrier values onto a set of Orthogonal Frequency Division Multiplexing (OFDM) subcarriers assigned for use by the user device, to produce a plurality of modulated subcarriers; and
>
> producing a time-domain waveform ***t***hat comprises a superposition of the plurality of modulated subcarriers, the time-domain waveform to be transmitted in the wireless network by the user device;
>
> wherein the set of subcarrier values comprises a first polyphase code that encodes **a first of the set of data symbols** and at least a second polyphase code that encodes at least **a second of the set of data symbols**;
>
> wherein the first polyphase code causes constructive and destructive interference between the plurality of modulated subcarriers to produce a first periodic pulse waveform having a peak value that is centered at a first time in an OFDM symbol interval, and the second polyphase code causes constructive and destructive interference between the plurality of modulated subcarriers to produce a second periodic pulse waveform having a peak value that is centered at a second time in the OFDM symbol interval, the second time different from the first time.

As shown, the claim provides for "***a*** set of data symbols" that is subsequently referred to as "***the*** set of data symbols." So, "a first of the set of data symbols" must be some constituent of that set of data symbols. It logically follows then that "a first" refers to a first member of the full set of

data symbols. Or, in other words, a first data symbol of the set of data symbols. Plaintiff has not advanced an alternative interpretation.

This understanding is reinforced by the parallel structure of the claim language. The claim recites "a first polyphase code that encodes a first of the set of data symbols and at least a second polyphase code that encodes at least a second of the set of data symbols." The parallelism between "a first polyphase code" encoding "a first of the set of data symbols" and "a second polyphase code" encoding "a second of the set of data symbols" indicates that each polyphase code corresponds to an individual data symbol from the set. The grammatical structure suggests a one-to-one relationship: one code encodes one data symbol from the set.

The specification supports this association as it explains: "The data symbols are typically provided with polyphase codes and modulated onto the individual CI carriers. Each polyphase code maps its associated data symbol to a particular instant in time." ('285 Patent at 53:26-29.) FIG. 29B illustrates the same by showing a set of data symbols d1 to dN (each d being a data symbol) mapped to a number N of orthogonal CI phase spaces containing polyphase code chips to produce subcarrier weights w1 to wN. (*Id.*, FIG. 29B; 68:8-15.) These descriptions confirm that when the claims refer to "a first of the set of data symbols," they are referring to a first data symbol from the set that is encoded by the first polyphase code. Similarly, "a second of the set of data symbols" refers to a second data symbol from the set that is encoded by the second polyphase code.

As apparent from the parties' briefing, ambiguity exists in this term as to what "a first of" and "a second of" is describing within "the set of data symbols" that can benefit from clarification. Accordingly, the Court construes "a first of the set of data symbols" **to mean "a first data symbol**

**of the set of data symbols,"** and "a second of the set of data symbols" **to mean "a second data symbol of the set of data symbols."**

### 11. "wherein the spreading matrix comprises an N-point Discrete Fourier Transform (DFT)"

| Claim term | Plaintiff's Construction | Defendant's Construction |
|---|---|---|
| "wherein the spreading matrix comprises an N-point Discrete Fourier Transform (DFT)"<br><br>('227 Patent, claim 18) | Does not require construction<br><br>Plain and ordinary meaning to POSITA<br><br>Not indefinite | The full scope of the claim is not reasonably certain and thus this phrase renders the claim indefinite because this claim is nonsensical. |

The issue as to this term is whether claim 18 of the '227 patent is indefinite under 35 U.S.C. § 112 because it recites a "spreading matrix [that] comprises an N-point Discrete Fourier Transform (DFT)."

Plaintiff argues the term requires no construction and is not indefinite because an N-point DFT, including its expression in matrix form, is well understood in the art. Plaintiff relies on Dr. Goldburg's declaration that both "N-point DFT" and "N-point DFT matrix" are readily understood and unambiguous to a person of ordinary skill in the art. According to Plaintiff, the patent specification confirms that a spreader can comprise an N-point DFT with associated complex spreading codes that are orthogonal and expressible in matrix form. Specifically, the specification states that an N-point DFT "can be used to spread the information symbols to produce coded symbols that are complex-weighted sums of the information symbols . . . [and] comprise a wide variety of complex spreading codes that are orthogonal (and/or nearly orthogonal), the variety employing DFT coefficients being among the simplest." ('227 Patent at 68:62-69:6.) Plaintiff

notes that even Defendant's own expert, Dr. Mahon, agrees that "[i]n mathematical terms, claim 18 says that 'the spreading matrix' (e.g., 'S') 'comprises an N-point Discrete Fourier Transform.'" (Dkt. No. 125-12, ¶22.)

Defendant contends that the phrase "wherein the spreading matrix comprises an N-point Discrete Fourier Transform (DFT)" would make no sense to a skilled artisan because an N-point DFT is not a matrix, so the claim is indefinite. Defendant's logic centers on the hierarchical structure of the claims. Independent claim 11 recites, in relevant part:

> "performing an invertible transform, comprising multiplying a plurality of data symbols by **a complex-valued spreading matrix** to produce a plurality of spread symbols."

Dependent claim 18 then adds:

> "The method recited in claim 11, **wherein the spreading matrix comprises an N-point Discrete Fourier Transform (DFT)**"

According to Defendant, it is nonsensical for an invertible transform to comprise multiplying a plurality of data symbols by a spreading matrix that is itself another transform (the N-point DFT). Put differently, Defendant argues that claim 18 improperly requires insertion of an equation (a "transform") into a sub-component (the "spreading matrix") that is used to perform the equation. While Defendant acknowledges that a "DFT matrix" can be a spreading matrix, it objects that claim 18 does not call it an N-point DFT "matrix," but instead claims an equation, the "N-point discrete Fourier transform (DFT)." Defendant urges the Court to not rewrite the claim in order to preserve its validity.

Defendant's indefiniteness challenge, however, does not rise to the level of the clear and convincing evidence that is required to invalidate a patent claim. This Court finds that a person of

ordinary skill in the art can reasonably understand the disputed limitation within the context of the '227 Patent such that claim 18 is not indefinite.

The Court is persuaded that one of ordinary skill in the art would understand that "the spreading matrix comprises an N-point Discrete Fourier Transform (DFT)" to refer to the DFT matrix rather than an iterative transform operation. Even accepting that Defendant's argument and Dr. Mahon's testimony about mathematical abstraction may be technically correct in the abstract, such a view is far more literal than a person of ordinary skill would adopt when reading the patent as a whole. This artificially narrow interpretation lacks support in the way the term is actually used in the art and in the specification.

To the extent Defendant questions whether the disputed term refers to an equation or a matrix, the claim language itself already expressly confines the element to a "spreading matrix." A skilled person would reasonably understand the claim as referencing a matrix implementation of the mathematical equation, particularly when the claim itself makes clear the term refers to a matrix.

The specification reinforces this understanding. It explains that "In accordance with some aspects of the disclosure, the DFT spreader comprises an N-point DFT . . . ." ('227 Patent at 68:62-63.) When discussing an N-point DFT in the spreading context, the specification clarifies it refers to a matrix: "In one aspect, the invertible transform matrix S is an NxN DFT matrix." (*Id.* at 73:48-51). The immediately following sentence describes the matrix operation: "Each row (e.g., row 3201) of the matrix S multiplies original data vector b (which comprises N values) to produce a coded data symbol xi." (*Id.* at 73:51-53). This assists one of skill reading the patent to understand that an N-point DFT, in the context of a spreading matrix, refers to the matrix form of the DFT. Moreover, the N dimension simply specifies the dimension of the transform. Every matrix has a

dimension, so specifying N essentially adds no additional limitation beyond what "spreading matrix" already conveys.

Indeed, the portions of the specification quoted by both sides directly describe claim 18 in the context of claim 11. The specification discusses "Spread-DFT source code segment 3102" which "can be configured to perform an N-point DFT to produce frequency-domain symbols which are the DFT-spread input symbols b." (*Id.* at 73:40-43). This source code segment implements the spreading operation recited in claim 11. The specification then explains: "In one aspect, the invertible transform matrix S is an NxN DFT matrix." (*Id.* at 73:50-51). This directly corresponds to claim 18's limitation that "the spreading matrix comprises an N-point Discrete Fourier Transform (DFT)." The specification makes abundantly clear that the equation x=Sb from claim 11 can have an implementation where the spreading matrix S is an NxN DFT matrix, which is precisely what claim 18 is about. The specification expressly bridges the connection between the matrix S in claim 11 and the N-point DFT in claim 18.

Plaintiff's expert testimony supports this reading. Dr. Goldburg opined that a person of skill in the art would understand an "N-point DFT" and "N-point DFT matrix" to be expressions of an N-point discrete Fourier Transform (DFT) and that the DFT can be expressed in matrix form and perform a spreading function. (Dkt. No. 125-10, ¶¶23-25.) In particular, the DFT is a mathematical operation often expressed by a matrix: "When the DFT is written in matrix form, each column of the transformation matrix is the frequency domain code corresponding to a particular element – a data symbol, for example – in the transform's input vector." (Dkt. No. 125-9, ¶108.) This expert testimony, combined with extrinsic evidence showing that N-point DFTs were well-known in the art, supports the conclusion that a skilled artisan would understand the disputed term without confusion.

In contrast, Defendant's expert submits no opinion on whether a person of skill would perceive a difference between a "DFT matrix" and an "N-point discrete Fourier transform (DFT)" in this context. Nor does he opine that the difference in phrasing (omitting "matrix" from the latter) results in an unreasonable ambiguity within the patent as a whole. Instead, Dr. Mahon argues that claim 18 is nonsensical based on a fundamental misunderstanding of what the claim requires. Dr. Mahon's declaration assumes that "wherein the spreading matrix comprises an N-point Discrete Fourier Transform (DFT)," as recited in claim 18, defines the "spreading matrix" as the equation x=S*b, that multiplies a matrix within itself. (Dkt. No. 125-12, ¶23.) But this is an overly pedantic reading and not what the claim states. The spreading matrix is not the DFT ***of a vector***; rather, the spreading matrix S performs the DFT ***on a vector***. Dr. Mahon himself acknowledges this is the case when he explains that "claim 11 claims an 'invertible transform' that comprises matrix multiplying two things: a complex-valued spreading matrix and a plurality of spread symbols," where the plurality of symbols is what Dr. Mahon identified as vector 'b.' (*Id.*, ¶19.) This acknowledgment is consistent with the specification at column 73, which describes exactly this operation: the matrix S multiplies the data vector b to produce spread symbols x, illustrated as the equation S*b=x, where S can be an NxN DFT matrix. It would indeed be illogical for the matrix S to be separately defined as another matrix being multiplied by data vector b. Thus, Dr. Mahon's opinion rests on an incorrect comprehension of the claim that even his own testimony contradicts. The Court finds Dr. Goldburg's testimony to be more credible here.

Furthermore, Defendant's argument that Plaintiff seeks to rewrite the claim ignores that claim 18 already specifies "spreading matrix" as the noun being modified. Though the language could be more precise, the claim does not require rewriting. Instead, it requires reading the term in context, which plainly indicates that the N-point DFT is functioning as a spreading matrix.

Defendant has failed to meet its clear and convincing burden of persuasion that claim 18 is indefinite for failing to inform, with reasonable certainty, those skilled in the art about the scope of the invention. The claim language, specification, and expert testimony all support the conclusion that a skilled artisan would understand that a spreading matrix can comprise an N-point DFT.

Accordingly, the Court finds the term "wherein the spreading matrix comprises an N-point Discrete Fourier Transform (DFT)" **is not indefinite and should be given its plain and ordinary meaning.**

**12. "user equipment"**

| Claim term | Plaintiff's Construction | Defendant's Construction |
|---|---|---|
| "User Equipment"<br><br>('227 Patent, claims 21, 24) | Does not require construction, plain and ordinary meaning to POSITA.<br><br>If construed:<br>a subscriber device, mobile terminal, user terminal, wireless terminal, subscriber terminal, client terminal, subscriber unit, mobile unit, subscriber device, mobile device, wireless device, client device, client terminal, client unit, mobile network device, mobile handset, wireless handset, or some other terminology indicating a WWAN-enabled client device. | Any device used directly by an end user (or client device) to communicate in a radio access network.<br><br>"User Equipment" is defined as including any device that connects to a base station NodeB or eNodeB as specified in the ETSI 125/136-series and 3GPP 25/36-series of specifications. |

The dispute to be resolved as to this term is whether the patentee acted as his own lexicographer in defining "user equipment" in the patent specification, what that definition is, and whether a construction would be helpful to the jury.

Upon review of the parties' briefing and hearing oral argument, the Court notes that both sides rely upon the same citations to the specification for their proposed constructions. The relevant specification language provides:

> **User Equipment (UE), as used herein, may be fixed or mobile and comprises any device used directly by an end user (or client device) to communicate in a radio access network**. For example, a UE can be a cellular handset, a laptop equipped with a mobile broadband adaptor, a wearable computer, a PDA, a tablet, or any other user device configured to communicate with a Wireless Wide Area Network (WWAN). A WWAN is also referred to as a radio access network (RAN). A UE comprises an RF transceiver for fixed and/or mobile clients receiving data streams over the downlink channel of the WWAN and transmitting data via the WWAN's uplink (UL) channel. While a UE is defined in the Universal Mobile Telecommunications System (UMTS) and 3GPP Long Term Evolution (LTE) as <u>any device that connects to a base station NodeB or eNodeB as specified in the ETSI 125/136-series and 3GPP 25/36-series of specifications</u>, UEs include equivalent devices, such as mobile stations in GSM systems and client devices in other wireless networks. As used herein, a UE may also be referred to as *a subscriber device, mobile terminal, user terminal, wireless terminal, subscriber terminal, client terminal, subscriber unit, mobile unit, subscriber device, mobile device, wireless device, client device, client terminal, client unit, mobile network device, mobile handset, wireless handset, or some other terminology indicating a WWAN-enabled client device*.
>
> In general, the various embodiments of the UE can include, but are not limited to, cellular mobile devices, personal digital assistants (PDAs) having wireless communication capabilities, portable computers having wireless communication capabilities, image capture devices such as digital cameras having wireless communication capabilities, gaming devices having wireless communication capabilities, music storage and playback appliances having wireless communication capabilities, Internet appliances permitting wireless Internet access and browsing, as well as portable units or terminals that incorporate combinations of such functions. Examples of UEs are provided in 3GPP technical specification (TS) 36.306, Release 8, the disclosure of which is incorporated herein by reference in its entirety.
>
> ('227 Patent at 13:12-51.)

Plaintiff urges a plain and ordinary meaning of "user equipment" because the term is self-descriptive and well-understood by those of ordinary skill in the art. If the term requires construction, Plaintiff proposes its alternative construction extracted from the specification above

in *italics*. Plaintiff contends this alternative definition is consistent with the definitional sentence, while adding more explanation to the phrase "radio access network," which may otherwise confuse the jury.

Defendant contends that the inventor expressly defined "user equipment" in the **bolded** sentence above and his intent is made clear by the phrase "as used herein." Thus, the inventor's lexicography is controlling. Defendant proposes a two-part construction using the bolded sentence and appending the portion that is underlined, which it asserts is a non-limiting category of qualifying devices. Defendant rejects Plaintiff's alternative construction as improperly narrow, arguing that the specification's statement that User Equipment may "also" be referred to by different names does not limit the term to only those devices.

The Court's analysis begins with noting that both parties advocate a broad interpretation of user equipment that is not limited to the referenced ETSI or 3GPP standards, which are included in the patent as exemplary embodiments and should not be imported to limit the claim.

The phrase "as used herein" typically signals lexicography, and the specification employs this definitional language when introducing User Equipment: "User Equipment (UE), as used herein." ('227 Patent at 13:12.) The specification does not, however, provide a restrictive definition. Instead, it proceeds in an expressly non-limiting manner, stating that UE "may be fixed or mobile" and includes "any device used directly by an end user (or client device) to communicate in a radio access network." (*Id.* at 13:12-15.)

The specification then dedicates two paragraphs to expanding this broad definition through non-exhaustive examples and descriptions of equivalent devices across various wireless standards. It catalogs examples of UE devices including cellular handsets, laptops with mobile broadband adaptors, wearable computers, PDAs, and tablets. (*Id.* at 13:15-23.) After defining related terms

like WWAN and RAN and describing RF transceiver components, the specification acknowledges UMTS and 3GPP LTE definitions while explicitly stating that "UEs include equivalent devices, such as mobile stations in GSM systems and client devices in other wireless networks." (*Id.* at 13:23-28.) The specification concludes with alternative terminology by which a UE may be referenced, including subscriber device and mobile terminal. (*Id.* at 13:28-37.)

The second paragraph further expands on "the various embodiments of the UE" by providing a non-exhaustive collection ("can include, but are not limited to") of device types (cellular mobile devices, PDAs, portable computers, image capture devices, gaming devices, music storage and playback appliances, Internet appliances) and incorporates by reference 3GPP technical specification (TS) 36.306, Release 8, stating that "Examples of UEs are provided in" this specification. ('227 Patent at 13:37-51.)

Significantly, the specification acknowledges that UE "is defined" in UMTS and 3GPP LTE standards while simultaneously clarifying that "UEs include equivalent devices" beyond those standards. ('227 Patent at 13:23-28.) This language demonstrates the inventor's intent to ensure broad coverage without limiting the definition to any specific standard.

The structure and content of the specification supports the conclusion that the inventor intended a broad, inclusive definition of UE encompassing any device used by an end user that can connect with a wireless network. In particular, the opening "as used herein" definition uses the word "comprises," which is a term of art in patent law that is generally understood to mean "including but not limited to." This open-ended transitional phrase signals that the definition is not restrictive.

Moreover, Dr. Goldburg's testimony establishes that persons of ordinary skill in the art understood the term "user equipment" from the earliest days of mobile telephony and that the term

was in use by the industry by at least 1999. (Dkt. No. 125-9, ¶39). The inventor's choice to use this well-known industry term, combined with the extensive elaboration in the specification, indicates an intent to capture the full breadth of devices understood by skilled artisans to constitute user equipment.

Evidence from related patents further support this understanding. Defendant points to Patent No. 9,819,449, the immediately preceding parent application, which uses phrases like "cellular handsets" and "wireless mobile devices" rather than "User Equipment." (*See* Dkt. No. 126 at 26, citing Ex. J., '449 Patent at 12:30-34). The evolution in terminology from more specific device names to the broader industry term "User Equipment" reflects the inventor's deliberate choice to broaden the scope to encompass emerging and future technologies.

Having established that the inventor intended the broadest possible definition, the Court must now determine whether providing a construction beyond the plain and ordinary meaning would aid the jury or create confusion.

The parties' proposed constructions underscore the difficulty of formulating a definition that captures the inventor's broad intent without either introducing unnecessary limitations or creating confusion. Defendant's two-part construction attempts to incorporate the specification language but risks suggesting limitations not intended by the inventor. Plaintiff's alternative construction is also insufficient as it derives from a non-restrictive listing of embodiments.

The term "user equipment" is fundamentally self-descriptive within the technical field of wireless communications, as Dr. Goldburg testified and as supported by the submitted technical specifications and proposals using the term, as well as the standards cited in the patent. Defendant has presented no evidence to the contrary. Given the established meaning in the art, the plain and ordinary meaning of "user equipment" most effectively communicates the concept to both skilled

artisans and, with appropriate context, to a jury. Any other definition in this context would either artificially constrain its breadth or be too cumbersome to comprehend.

For the above reasons, the Court finds "user equipment" **should be given its plain and ordinary meaning.**

### 13. "A User Equipment configured to perform the method recited in claim 11"

| Claim term | Plaintiff's Construction | Defendant's Construction |
|---|---|---|
| "A User Equipment configured to perform the method recited in claim 11"<br><br>('227 Patent, claim 21) | Does not require construction<br><br>Plain and ordinary meaning to POSITA<br><br>Not indefinite<br><br>Claim 21 is an apparatus claim | The full scope of the claim is not reasonably certain and thus this phrase renders the claim indefinite because it recites an apparatus without any structure and/or is a mixed apparatus and method. |

The dispute for the Court to resolve as to claim 21 of the '227 Patent is whether it is indefinite for improper claiming both an apparatus and a method claim in violation of 35 U.S.C. § 112.

Defendant contends that claim 21 impermissibly mixes statutory classes by reciting an apparatus that depends from and incorporates a method claim, thereby creating ambiguity about when infringement occurs and what structures are required. According to Defendant, this hybrid claiming renders the claim indefinite.

Plaintiff responds that claim 21 is a straightforward apparatus claim entitled to its plain and ordinary meaning. Plaintiff argues the claim validly recites a structural element, User Equipment, that is configured to perform the method of claim 11. According to Plaintiff, this claim structure

comports with MPEP § 2173.05(f) ("Reference to Limitations in Another Claim"), which provides that a claim written as a "product produced by the method of" a preceding claim is not indefinite. Plaintiff further contends that persons of ordinary skill would understand "User Equipment" to be a structural element with physical and tangible form, such that infringement occurs upon creation or sale of the configured apparatus rather than upon actual user operation.

Defendant counters that by MPEP § 2173.05(f) does not apply because claim 21 does not recite a "product produced by a method of" another claim. Defendant relies on *NetSocket, Inc. v. Cisco Sys., Inc.*, No. 2:22-cv-172-JRG, 2024 WL 5454527at *26 (E.D. Tex. May 29, 2024), where the court found an apparatus claim depending from a method claim indefinite under analogous circumstances. Defendant additionally argues that claim 21 cannot be a valid apparatus claim because it recites no structural elements for performing what are otherwise method steps, consisting instead of purely functional language.

The key question for the Court to decide is when infringement occurs for claim 21, whether at the time one creates an infringing system or when one actually uses the system in an infringing manner. This is a legal determination the Court addresses after considering the intrinsic and extrinsic evidence.

The Court begins by examining the text of claims 11 and 21 to understand the claim structure and limitations. Claims 11 and 21 of the '227 Patent recites as follows:

> 11. A method, comprising:
>
> performing an invertible transform, comprising multiplying a plurality of data symbols by a complex-valued spreading matrix to produce a plurality of spread symbols;
>
> mapping the plurality of spread symbols to a plurality of Orthogonal Frequency Division Multiplexing (OFDM) subcarriers; and

> modulating the plurality of spread symbols onto the plurality of OFDM subcarriers to produce a spread OFDM signal to be transmitted into a wireless channel, wherein the spread OFDM signal comprises a superposition of the OFDM subcarriers, and wherein the complex-valued spreading matrix is configured to provide the superposition with a reduced peak-to-average power ratio (PAPR).
>
> 21. A User Equipment configured to perform the method recited in claim 11.

On its face, claim 21 is framed as an apparatus claim beginning with "[a] User Equipment," which is a physical device used to communicate in a network, as established above. The claim specifies that this User Equipment is "configured to perform the method recited in claim 11." Because claim 21, an apparatus claim, depends from claim 11, a method claim, the question is whether this claim structure constitutes impermissible hybrid claiming that renders the claim indefinite.

"[A] single claim covering both an apparatus and a method of use of that apparatus" fails to meet the requirements of § 112 when "it is unclear whether infringement . . . occurs when one creates a[n infringing] system, or whether infringement occurs when the user actually uses [the system in an infringing manner]." *IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377, 1384 (Fed. Cir. 2005).

Claim 21 exemplifies this problem. By incorporating method claim 11, it recites "[a] User Equipment configured to perform the method" of "performing an invertible transform . . . ; mapping the plurality of spread symbols to a plurality of Orthogonal Frequency Division Multiplexing (OFDM) subcarriers; and modulating the plurality of spread symbols onto the plurality of OFDM subcarriers . . ." subject to two additional parameters. If claim 21 can be infringed without performing the method steps, it creates the improper scenario where an accused infringer could satisfy the dependent claim without satisfying independent claim 11 upon which it depends. or conversely, where the apparatus claim's scope becomes tied to active performance of

method steps rather than the apparatus's structural configuration. In order for both the dependent and independent claims to be infringed, the apparatus must be used in an infringing manner that performs the recited steps.

A review of claims 25 and 41 in *NetSocket* is instructive. 2024 WL 5454527at *26. There, the claims recite as follows, with the relevant portions in bold:

> 25. **A method** for reserving resources within an IP network to obtain a predetermined QoS between a source terminal within a source domain and a destination terminal within a destination domain, the method comprising the steps of:
>
> > a first Network Resource Manager (NRM), located within said source domain, requesting ...
> >
> > the second NRM announcing ...
> >
> > the first NRM and the second NRM performing ...; and
> > using an NRM path vector.
>
> 41. **A computer program product stored on a computer usable medium**, comprising readable program for causing a processing means in an IP network, to control the execution of the steps of claim 25.

The *NetSocket* decision found that claim 41 depends from claim 25, and that "[a] claim in dependent form shall be construed to incorporate by reference all the limitations of the claim to which it refers" *Id*. at *27 (quoting 35 U.S.C. § 112, ¶4) (emphasis in original). Doing so created "a direct conflict between whether Claim 41 is infringed by performing 'method' steps or instead is infringed by making, using, selling, or offering for sale a 'computer program product stored on a computer usable medium.' " *Id*. The conflict in statutory classes resulted in claim 41 being deemed indefinite.

Claim 21 of the '227 Patent presents the same fundamental problem. Like *NetSocket*, claim 21 is styled as an apparatus claim but incorporates by reference all the limitations of a method claim. The incorporation is complete in that claim 21 necessarily includes all of claim 11's method

steps: "performing an invertible transform," "mapping," and "modulating." This results in the same direct conflict identified in *NetSocket*: It is unclear whether infringement of claim 21 occurs by making, using, selling, or offering for sale a User Equipment (apparatus infringement), or whether infringement occurs by performing the method steps of claim 11 (method infringement).

Plaintiff's attempt to distinguish *NetSocket* is unpersuasive. Plaintiff argues that *NetSocket* "was about a dependent claim that purported to incorporate only a part of another claim," but this mischaracterizes the *NetSocket* decision. The *NetSocket* claim incorporated "the steps of claim 25"—all of them, not merely a part. The problem was not partial incorporation but rather the mixing of statutory classes by having an apparatus/product claim depend from a method claim. That is precisely the problem here.

In addition to the mixing of statutory classes, claim 21 is problematic for purely functional claiming. There is no disclosure about the special structures within the User Equipment that are necessary to perform the recited functions or any identification of structure more granular than the UE apparatus. It is entirely up to the reader to deduce how to configure it to perform the method steps in claim 11. While apparatus claims are not necessarily indefinite for using functional language, they must be "clearly limited to a[n apparatus] possessing the recited structure and capable of performing the recited functions." *Microprocessor Enhancement Corp. v. Texas Instruments Inc.*, 520 F.3d 1367, 1375 (Fed. Cir. 2008). Here, claim 21 recites such inadequate structure that it falls squarely within the category of impermissible functional claiming that purports to "cover any means which anyone may ever discover of producing" the claimed result. *Markem-Imaje*, 2012 U.S. Dist. LEXIS 112502 at *25 (internal quotations and citation omitted).

Plaintiff's reliance on MPEP 2173.05(f) is misplaced. While MPEP 2173.05(f) permits certain references to preceding claims to define limitations, the examples it provides are

instructive. The MPEP specifically references claims such as "The product produced by the method of claim 1," which describes a product defined by the process used to make it. This is fundamentally different from claim 21, which claims an apparatus defined not by how it was made, but by its capability to perform method steps during operation. The distinction is critical. A product-by-process claim covers a product with particular characteristics resulting from a manufacturing process, while claim 21 purports to cover any apparatus capable of performing functional steps, without regard to structure.

Regarding Dr. Goldburg's testimony, the Court finds it unpersuasive on the legal question of indefiniteness. Whether a claim term is indefinite is a question of law for the Court to decide based on underlying factual findings. While expert testimony can inform the Court's understanding of how a person of ordinary skill would understand the claim, the ultimate determination of indefiniteness remains with the Court. Moreover, Dr. Goldburg's opinion is of limited value here because, as he admits in his declaration, his opinion is premised on being "told by GenghisComm's lawyers that '227 claim 21 is an apparatus claim . . . ." (Dkt. No. 125-10, ¶38.) Additionally, while Dr. Goldburg concluded that "User Equipment" is a structural element, he did not identify any particular structure beyond the functional capability to perform the method of claim 11. (*Id.*, ¶37.).

Indefiniteness is a question of law based on underlying factual findings. The party challenging the claim as indefinite must prove indefiniteness by clear and convincing evidence. *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 95 (2011). The Court finds that Defendant has met its burden here.

Claim 21 creates a conflict about when infringement occurs and what structures are required to meet the claim. The claim recites an apparatus but defines it solely by its capability to perform method steps, without identifying any structural elements beyond the general term "User

Equipment" that would allow one of skill in the art to determine what structures are required. By incorporating all the limitations of method claim 11, claim 21 mixes statutory classes in a manner that creates ambiguity about whether infringement occurs by making or selling an apparatus, or by performing a method. This ambiguity, combined with the lack of structural limitations beyond pure functionality, renders the claim indefinite.

For the foregoing reasons, the Court finds **claim 21 of the '227 Patent is indefinite.**

## V. CONCLUSION

The Court adopts the constructions as set forth in this opinion for the disputed terms of the Patents-at-Issue.

The parties are ordered that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury. Likewise, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the Court, in the presence of the jury. Any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the Court.

**SIGNED this 28th day of November, 2025.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE